PATTERN MAKERS' LEAGUE OF NORTH AMERICA,
AFL–CIO, ET AL. *v.* NATIONAL LABOR
RELATIONS BOARD ET AL.

No. 83–1894.   Argued February 27, 1985—Reargued April 22, 1985—
Decided June 27, 1985

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, REHNQUIST, and O'CONNOR, JJ., joined. WHITE, J., filed a concurring opinion, *post*, p. 116. BLACKMUN, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 117. STEVENS, J., filed a dissenting opinion, *post*, p. 133.

*Laurence Gold* reargued the cause for petitioners. With him on the briefs were *Marsha S. Berzon, Michael Rubin, George Kaufmann,* and *David M. Silberman.*

*Deputy Solicitor General Fried* reargued the cause for respondent National Labor Relations Board. With him on the brief were *Solicitor General Lee, Norton J. Come,* and *Linda Sher. Edward J. Fahy* filed a brief for respondent Rockford-Beloit Pattern Jobbers Association.*

JUSTICE POWELL delivered the opinion of the Court.

The Pattern Makers' League of North America, AFL–CIO (League), a labor union, provides in its constitution that resignations are not permitted during a strike or when a strike is imminent. The League fined 10 of its members who, in violation of this provision, resigned during a strike and returned to work. The National Labor Relations Board held that these fines were imposed in violation of § 8(b)(1)(A) of the National Labor Relations Act, 29 U. S. C. § 158(b)(1)(A). We granted a petition for a writ of certiorari in order to decide whether § 8(b)(1)(A) reasonably may be construed by the

---

*Paul Alan Levy* and *Alan B. Morrison* filed a brief for Teamsters for a Democratic Union as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the Chamber of Commerce of the United States by *Carl L. Taylor, Glenn Summers,* and *Stephan A. Bokat;* for the National Right to Work Legal Defense Foundation by *Raymond J. LaJeunesse, Jr.;* and for Safeway Stores, Inc., et al. by *Warren M. Davison* and *Wesley J. Fastiff.*

Board as prohibiting a union from fining members who have tendered resignations invalid under the union constitution.

I

The League is a national union composed of local associations (locals). In May 1976, its constitution was amended to provide that

"[n]o resignation or withdrawal from an Association, or from the League, shall be accepted during a strike or lockout, or at a time when a strike or lockout appears imminent."

This amendment, known as League Law 13, became effective in October 1976, after being ratified by the League's locals. On May 5, 1977, when a collective-bargaining agreement expired, two locals began an economic strike against several manufacturing companies in Rockford, Illinois, and Beloit, Wisconsin. Forty-three of the two locals' members participated. In early September 1977, after the locals formally rejected a contract offer, a striking union member submitted a letter of resignation to the Beloit Association.[1] He returned to work the following day. During the next three months, 10 more union members resigned from the Rockford and Beloit locals and returned to work. On December 19, 1977, the strike ended when the parties signed a new collective-bargaining agreement. The locals notified 10 employees who had resigned that their resignations had been rejected as violative of League Law 13.[2] The locals further informed the

---

[1] William Kohl complained in his letter: "I no longer feel that the union officers are acting in the best interest of the men. We need fair and reasonable negotiators to solve our problems." 3 Record, General Counsel Exhibit 2.

[2] Kohl, the other employee who returned to work, was expelled from the union. On January 14, 1978, the Beloit local notified Kohl's employer that because he was no longer a union member, he should be discharged pursuant to the "union shop" agreement. Two weeks later, the Beloit

employees that, as union members, they were subject to sanctions for returning to work. Each was fined approximately the equivalent of his earnings during the strike.

The Rockford-Beloit Pattern Jobbers' Association (Association) had represented the employers throughout the collective-bargaining process. It filed charges with the Board against the League and its two locals, the petitioners. Relying on § 8(b)(1)(A), the Association claimed that levying fines against employees who had resigned was an unfair labor practice.[3] Following a hearing, an Administrative Law Judge found that petitioners had violated § 8(b)(1)(A) by fining employees for returning to work after tendering resignations. *Pattern Makers' League of North America*, 265 N. L. R. B. 1332, 1339 (1982) (decision of G. Wacknov, ALJ). The Board agreed that § 8(b)(1)(A) prohibited the union from imposing sanctions on the 10 employees.[4] *Pattern Makers'*

---

local informed Kohl that he could gain readmission to the union, and thus remain employed, if he paid back dues, a readmission fee, and $4,200 in "damages . . . for deserting the strike by returning to work." *Pattern Makers' League of North America*, 265 N. L. R. B. 1332, 1337 (1982) (decision of G. Wacknov, ALJ). Kohl was denied readmission to the union because he refused to pay the amounts allegedly due. Nevertheless, he was not discharged by his employer. *Ibid.*

[3] The Association also charged that petitioners committed the following unfair labor practices: (i) threatening employees with physical harm and loss of accrued pension benefits if they returned to work during the strike; and (2) attempting to have Kohl and another employee, John Nelson, discharged pursuant to a "union shop" agreement. *Ibid.* These charges are unrelated to the question presented in this case. Therefore, we express no opinion concerning the disposition of these claims by the ALJ, the Board, and the Court of Appeals.

[4] Writing separately, Member Fanning asserted that a restriction on the right to resign would not violate § 8(b)(1)(A) if it functioned only to prevent members from removing their names from the union's rolls. He agreed, however, that the employees could not be fined for returning to work after tendering their resignations. *Pattern Makers' League of North America*, *supra*, at 1335 (Member Fanning, concurring and dissenting in part). Member Jenkins dissented, as he did in *Machinist Local 1327 (Dalmo Victor II)*, 263 N. L. R. B. 984 (1982), enf. denied, 725 F. 2d 1212 (CA9 1984). See n. 5, *infra.*

*League of North America, supra.* In holding that League Law 13 did not justify the imposition of fines on the members who attempted to resign, the Board relied on its earlier decision in *Machinists Local 1327 (Dalmo Victor II)*, 263 N. L. R. B. 984 (1982), enf. denied, 725 F. 2d 1212 (CA9 1984).[5]

The United States Court of Appeals for the Seventh Circuit enforced the Board's order. 724 F. 2d 57 (1983). The Court of Appeals stated that by restricting the union members' freedom to resign, League Law 13 "frustrate[d] the overriding policy of labor law that employees be free to choose whether to engage in concerted activities." *Id.*, at 60. Noting that the "mutual reliance" theory was given little weight in *NLRB* v. *Textile Workers*, 409 U. S. 213 (1972), the court rejected petitioners' argument that their members, by participating in the strike vote, had "waived their Section 7 right to abandon the strike." 724 F. 2d, at 60–61. Finally, the Court of Appeals reasoned that under *Scofield*

---

[5] In *Machinists Local 1327 (Dalmo Victor II)*, several employees resigned from a union and returned to work during a strike. The union constitution prohibited resignations during, or within 14 days preceding, strikes. As in this case, the employees' resignations were not accepted, and they were fined for aiding and abetting the employer. The Board held that fining these employees for returning to work after tendering resignations violated § 8(b)(1)(A).

Chairman Van de Water and Member Hunter stated that no restriction on the right to resign was permissible under the Act; they reasoned that such a rule allowed the union to exercise control over "external matters." Moreover, these Board members thought that restrictions on resignation impaired the congressional policy, embodied in § 8(a)(3), of voluntary unionism. Therefore, they concluded that any discipline premised on such a rule violates § 8(b)(1)(A). 263 N. L. R. B., at 988.

Members Fanning and Zimmerman asserted that a rule legitimately could restrict the right to resign for a period of 30 days. Because the rule in question restricted the right to resign indefinitely, however, they agreed that the union had violated § 8(b)(1)(A). *Id.*, at 987.

Member Jenkins, the lone dissenter, contended that the union's restriction on resignation was protected by the proviso to § 8(b)(1)(A), which states that a union may "prescribe its own rules with respect to the acquisition or retention of membership therein." *Id.*, at 993.

v. *NLRB*, 394 U. S. 423 (1969), labor organizations may impose disciplinary fines against members only if they are "free to leave the union and escape the rule[s]." 724 F. 2d, at 61.

We granted a petition for a writ of certiorari, 469 U. S. 814 (1984), to resolve the conflict between the Courts of Appeals over the validity of restrictions on union members' right to resign.[6] The Board has held that such restrictions are invalid and do not justify imposing sanctions on employees who have attempted to resign from the union. Because of the Board's "special competence" in the field of labor relations, its interpretation of the Act is accorded substantial deference. *NLRB* v. *Weingarten, Inc.*, 420 U. S. 251, 266 (1975). The question for decision today is thus narrowed to whether the Board's construction of § 8(b)(1)(A) is reasonable. See *NLRB* v. *City Disposal Systems, Inc.*, 465 U. S. 822, 830 (1984). We believe that § 8(b)(1)(A) properly may be construed as prohibiting the fining of employees who have tendered resignations ineffective under a restriction in the union constitution. We therefore affirm the judgment of the Court of Appeals enforcing the Board's order.

## II

### A

Section 7 of the Act, 29 U. S. C. § 157, grants employees the right to "refrain from any or all [concerted] . . . activities . . . ."[7] This general right is implemented by

---

[6] The Court of Appeals for the Ninth Circuit has held that a union may impose restrictions on its members' right to resign. *Machinists Local 1327 (Dalmo Victor II), supra*. See n. 5, *supra*, for a discussion of the Board decision that the Court of Appeals for the Ninth Circuit refused to enforce.

[7] Section 7 of the Act, as set forth in 29 U. S. C. § 157, provides:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall

§ 8(b)(1)(A). The latter section provides that a union commits an unfair labor practice if it "restrain[s] or coerce[s] employees in the exercise" of their § 7 rights.[8] When employee members of a union refuse to support a strike (whether or not a rule prohibits returning to work during a strike), they are refraining from "concerted activity." Therefore, imposing fines on these employees for returning to work "restrain[s]" the exercise of their § 7 rights. Indeed, if the terms "refrain" and "restrain or coerce" are interpreted literally, fining employees to enforce compliance with any union rule or policy would violate the Act.

Despite this language from the Act, the Court in *NLRB* v. *Allis-Chalmers Mfg. Co.*, 388 U. S. 175 (1967), held that § 8(b)(1)(A) does not prohibit labor organizations from fining current members. In *NLRB* v. *Textile Workers, supra,* and *Machinists* v. *NLRB*, 412 U. S. 84 (1973) *(per curiam)*, the Court found as a corollary that unions may not fine former members who have resigned lawfully. Neither *Textile Workers, supra,* nor *Machinists, supra,* however, involved a provision like League Law 13, restricting the members' right to resign. We decide today whether a union is precluded from fining employees who have attempted to resign when resignations are prohibited by the union's constitution.[9]

---

also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title."

[8] Section 8(b)(1)(A), as set forth in 29 U. S. C. § 158(b)(1)(A), provides: "It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: *Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein . . . ."

[9] In both *Textile Workers*, 409 U. S., at 217, and *Machinists*, 412 U. S., at 88, the Court explicitly left open the question of "the extent to which

## B

The Court's reasoning in *Allis-Chalmers, supra,* supports the Board's conclusion that petitioners in this case violated § 8(b)(1)(A). In *Allis-Chalmers,* the Court held that imposing court-enforceable fines against current union members does not "restrain or coerce" the workers in the exercise of their § 7 rights.[10] In so concluding, the Court relied on the legislative history of the Taft-Hartley Act. It noted that the sponsor of § 8(b)(1)(A) never intended for that provision "'to interfere with the internal affairs or organization of unions,'" 388 U. S., at 187, quoting 93 Cong. Rec. 4272 (1947) (statement of Sen. Ball), and that other proponents of the measure likewise disclaimed an intent to interfere with unions' "internal affairs." 388 U. S., at 187–190. From the legislative history, the Court reasoned that Congress did not intend to prohibit unions from fining present members, as this was an internal matter. The Court has emphasized that the crux of *Allis-Chalmers'* holding was the distinction between "internal and external enforcement of union rules . . . ." *Scofield* v. *NLRB,* 394 U. S., at 428. See also *NLRB* v. *Boeing Co.,* 412 U. S. 67, 73 (1973).

The congressional purpose to preserve unions' control over their own "internal affairs" does not suggest an intent to authorize restrictions on the right to resign. Traditionally, union members were free to resign and escape union disci-

_____

contractual restriction on a member's right to resign may be limited by the Act." *Ibid.*

[10] The proviso to § 8(b)(1)(A), 29 U. S. C. § 158(b)(1)(A), states that nothing in the section shall "impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein." The Court in *Allis-Chalmers* assumed that the proviso could not be read to authorize the imposition of court-enforceable fines. 388 U. S., at 192. See *NLRB* v. *Boeing Co.,* 412 U. S. 67, 71, n. 5 (1973) ("This Court . . . , in holding that court enforcement of union fines was not an unfair labor practice in *NLRB* v. *Allis-Chalmers Mfg. Co.,* relied on congressional intent only with respect to the first part of this section") (citation omitted).

pline.[11]   In 1947, union constitutional provisions restricting the right to resign were uncommon, if not unknown.[12] Therefore, allowing unions to "extend an employee's membership obligation through restrictions on resignation" would "expan[d] the definition of internal action" beyond the contours envisioned by the Taft-Hartley Congress. *International Assn. of Machinists, Local 1414 (Neufeld Porsche-Audi, Inc.)*, 270 N. L. R. B. No. 209, p. 11 (1984).[13]

## C

Language and reasoning from other opinions of this Court confirm that the Board's construction of § 8(b)(1)(A) is rea-

[11] See *Bossert* v. *Dhuy*, 221 N. Y. 342, 365, 117 N. E. 582, 587 (1917) ("The members of the organization . . . who are not willing to obey the orders of the organization are at liberty to withdraw therefrom"); *Barker Painting Co.* v. *Brotherhood of Painters*, 57 App. D. C. 322, 324, 23 F. 2d 743, 745, cert. denied, 276 U. S. 631 (1928) (It is "not unlawful for . . . unions to punish a member by fine, suspension, or expulsion for an infraction of the union rules, since membership in the union is purely voluntary"); *Bayer* v. *Brotherhood of Painters, Decorators and Paperhangers of America, Local 301*, 108 N. J. Eq. 257, 262, 154 A. 759, 761 (1931) ("association is a voluntary one, and the workmen may decline to become members or withdraw from membership, if dissatisfied with the conduct of its affairs"); *Mische* v. *Kaminski*, 127 Pa. Super. 66, 91–92, 193 A. 410, 421 (1937) (members "had a right to leave the union"); *Longshore Printing Co.* v. *Howell*, 26 Ore. 527, 540, 38 P. 547, 551 (1894) ("No resort can be had to compulsory methods of any kind either to increase, keep up, or retain such membership").

[12] Our attention has not been called to any provision limiting the right to resign in a union constitution extant in 1947.   Indeed, even by the 1970's, very few unions had such restrictions in their constitutions.   See Millan, Disciplinary Developments Under § 8(b)(1)(A) of the National Labor Relations Act, 20 Loyola L. Rev. 245, 269 (1974); Wellington, Union Fines and Workers' Rights, 85 Yale L. J. 1022, 1042 (1976).

[13] In *International Assn. of Machinists, Local 1414 (Neufeld Porsche-Audi, Inc.)*, a majority of the Board held that *any* restriction on the right to resign violates the Act.   This was the position taken by Chairman Van de Water and Member Hunter in *Machinists Local 1327 (Dalmo Victor II)*, 263 N. L. R. B. 984 (1982), enf. denied, 725 F. 2d 1212 (CA9 1984).   See n. 5, *supra*.

sonable. In *Scofield* v. *NLRB*, *supra*, the Court upheld a union rule setting a ceiling on the daily wages that members working on an incentive basis could earn. The union members' freedom to resign was critical to the Court's decision that the union rule did not "restrain or coerce" the employees within the meaning of § 8(b)(1)(A). It stated that the rule was "reasonably enforced against union members who [were] free to leave the union and escape the rule." *Id.*, at 430. The Court deemed it important that if members were unable to take full advantage of their contractual right to earn additional pay, it was because they had "chosen to become *and remain* union members." *Id.*, at 435 (emphasis added).

The decision in *NLRB* v. *Textile Workers*, 409 U. S. 213 (1972), also supports the Board's view that § 8(b)(1)(A) prohibits unions from punishing members not free to resign. There, 31 employees resigned their union membership and resumed working during a strike. We held that fining these former members "restrained or coerced" them, within the meaning of § 8(b)(1)(A). In reaching this conclusion, we said that "the vitality of § 7 requires that the member be free to refrain in November from the actions he endorsed in May." *Id.*, at 217–218. Restrictions on the right to resign curtail the freedom that the *Textile Workers* Court deemed so important. See also *Machinists* v. *NLRB*, 412 U. S. 84 (1973).

### III

Section 8(b)(1)(A) allows unions to enforce only those rules that "impai[r] no policy Congress has imbedded in the labor laws . . . ." *Scofield*, *supra*, at 430. The Board has found union restrictions on the right to resign to be inconsistent with the policy of voluntary unionism implicit in § 8(a)(3).[14]

---

[14] Section 8(a)(3), as set forth in 29 U. S. C. § 158(a)(3), provides:
"It shall be an unfair labor practice for an employer—

.        .        .        .        .

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership

See *International Assn. of Machinists, Inc., Local 1414 (Neufeld Porsche-Audi, Inc.), supra; Machinists Local 1327 (Dalmo Victor II)*, 263 N. L. R. B., at 992 (Chairman Van de Water and Member Hunter, concurring). We believe that the inconsistency between union restrictions on the right to resign and the policy of voluntary unionism supports the Board's conclusion that League Law 13 is invalid.

Closed shop agreements, legalized by the Wagner Act in 1935,[15] became quite common in the early 1940's. Under these agreements, employers could hire and retain in their employ only union members in good standing. R. Gorman,

---

in any labor organization: *Provided,* That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later . . . : *Provided further,* That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership."

Section 8(b)(2) of the Act, as set forth in 29 U. S. C. § 158(b)(2), complements § 8(a)(3) by providing that:

"It shall be an unfair labor practice for a labor organization or its agents—

. . . . .

"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership."

[15] Section 8(3) of the Wagner Act, ch. 372, 49 Stat. 452, generally barred discrimination based on union membership. A proviso to that section stated, however, that "nothing in this Act . . . shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership therein . . . ."

Labor Law, ch. 28, § 1, p. 639 (1976). Full union membership was thus compulsory in a closed shop; in order to keep their jobs, employees were required to attend union meetings, support union leaders, and otherwise adhere to union rules. Because of mounting objections to the closed shop, in 1947—after hearings and full consideration—Congress enacted the Taft-Hartley Act. Section 8(a)(3) of that Act effectively eliminated compulsory union membership by outlawing the closed shop. The union security agreements permitted by § 8(a)(3) require employees to pay dues, but an employee cannot be discharged for failing to abide by union rules or policies with which he disagrees.[16]

Full union membership thus no longer can be a requirement of employment. If a new employee refuses formally to join a union and subject himself to its discipline, he cannot be fired. Moreover, no employee can be discharged if he initially joins a union, and subsequently resigns. We think it noteworthy that § 8(a)(3) protects the employment rights of the dissatisfied member, as well as those of the worker who never assumed full union membership. By allowing employees to resign from a union at any time, § 8(a)(3) protects the employee whose views come to diverge from those of his union.

League Law 13 curtails this freedom to resign from full union membership. Nevertheless, petitioners contend

---

[16] Under § 8(a)(3), the only aspect of union membership that can be required pursuant to a union shop agreement is the payment of dues. See *Radio Officers* v. *NLRB*, 347 U. S. 17, 41 (1954) (union security agreements cannot be used for "any purpose other than to compel payment of union dues and fees"). " 'Membership,' as a condition of employment, is whittled down to its financial core." *NLRB* v. *General Motors Corp.*, 373 U. S. 734, 742 (1963). See also *Ellis* v. *Railway Clerks*, 466 U. S. 435 (1984) (under the Railway Labor Act, employees in a "union shop" cannot be compelled to pay dues to support certain union activities). Therefore, an employee required by a union security agreement to assume financial "membership" is not subject to union discipline. Such an employee is a "member" of the union only in the most limited sense.

that League Law 13 does not contravene the policy of voluntary unionism imbedded in the Act. They assert that this provision does not interfere with workers' employment rights because offending members are not discharged, but only fined. We find this argument unpersuasive, for a union has not left a "worker's employment rights inviolate when it exacts [his entire] paycheck in satisfaction of a fine imposed for working." Wellington, Union Fines and Workers' Rights, 85 Yale L. J. 1022, 1023 (1976). Congress in 1947 sought to eliminate completely any requirement that the employee maintain full union membership.[17] Therefore, the Board was justified in concluding that by restricting the right of employees to resign, League Law 13 impairs the policy of voluntary unionism.

## IV

We now consider specifically three arguments advanced by petitioners: (i) union rules restricting the right to resign are protected by the proviso to § 8(b)(1)(A); (ii) the legislative history of the Act shows that Congress did not intend to protect the right of union members to resign; and (iii) labor unions should be allowed to restrict the right to resign because other voluntary associations are permitted to do so.[18]

---

[17] The focus of § 8(a)(3) on employment rights is understandable because union restrictions on the right to resign were not an issue in 1947. See n. 12, *supra*, and accompanying text. Senator Taft, for example, stated that § 8(a)(3) was designed to prevent the discharge of workers for reasons other than nonpayment of dues, 93 Cong. Rec. 4885–4886 (1947), because this was "the usual type of abuse, and is the only type of abuse testified to." *Id.*, at 4886.

[18] The dissent suggests that the Board's decision is inconsistent with 29 U. S. C. § 163, which provides that nothing in the Act "shall be construed so as . . . to interfere with or impede or diminish in any way the right to strike." The Board does not believe, and neither do we, that its interpretation of § 8(b)(1)(A) impedes the "right to strike." "It [will] not outlaw anybody striking who want[s] to strike. It [will] not prevent anyone using the strike in a legitimate way . . . . All it [will] do [is] . . . outlaw such

## A

Petitioners first argue that the proviso to § 8(b)(1)(A) expressly allows unions to place restrictions on the right to resign.   The proviso states that nothing in § 8(b)(1)(A) shall "impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein."   29 U. S. C. § 158(b)(1)(A).   Petitioners contend that because League Law 13 places restrictions on the right to withdraw from the union, it is a "rul[e] with respect to the . . . retention of membership," within the meaning of the proviso.[19]

Neither the Board nor this Court has ever interpreted the proviso as allowing unions to make rules restricting the right

---

restraint and coercion as would prevent people from going to work if they wished to go to work."   93 Cong. Rec. 4436 (1947) (remarks of Sen. Taft).

Moreover, we do not believe that the effectiveness of strikes will be unduly hampered by the Board's decision.   An employee who voluntarily has joined a union will be reluctant to give up his membership.   As Dean Wellington has said:

"In making his resignation decision, the dissident must remember that the union whose policies he finds distasteful will continue to hold substantial economic power over him as exclusive bargaining agent.   By resigning, the worker surrenders his right to vote for union officials, to express himself at union meetings, and even to participate in determining the amount or use of dues he may be forced to pay under a union security clause."   Wellington, Union Fines and Workers' Rights, 85 Yale L. J. 1022, 1046 (1976).

[19] JUSTICE BLACKMUN's dissent asserts that League Law 13 is protected by the proviso because the rule "literally involv[es] the acquisition and retention of membership."   Post, at 121.   This interpretation of the proviso would authorize any union restriction on the right to resign.   The dissent does say that restrictions on resignation would not be permitted if they "furthered none of the purposes of collective action and self-organization."   Post, at 132, n. 5.   This limitation is illusory.   An absolute restriction on resignations would enhance a union's collective-bargaining power, as would a rule that prohibited resignations during the life of the collective-bargaining agreement.   In short, there is no limiting principle to the dissent's reading of the proviso.

to resign.[20]   Rather, the Court has assumed that "rules with respect to the . . . retention of membership" are those that provide for the expulsion of employees from the union.[21]   The legislative history of the Taft-Hartley Act is consistent with this interpretation.   Senator Holland, the proviso's sponsor, stated that § 8(b)(1)(A) should not outlaw union rules "which ha[ve] to do with the admission *or the expulsion* of members."   93 Cong. Rec. 4271 (1947) (emphasis added).   Senator Taft accepted the proviso, for he likewise believed that a union should be free to "refuse [a] man admission to the union, or *expel him from the union.*"   *Id.*, at 4272 (emphasis added).   Furthermore, the legislative history of the Labor-Management Reporting and Disclosure Act of 1959, 29 U. S. C. § 401 *et seq.*, confirms that the proviso was intended to protect union rules involving admission and expulsion.[22]

[20] JUSTICE BLACKMUN's dissent also interprets the proviso in a novel manner.   He asserts that the only union rules prohibited by § 8(b)(1)(A) are those which "seek to coerce an employee by utilizing the employer's power over his employment status, or otherwise compel him to take on duties or join in concerted activities he never consented to."   *Post*, at 120. This position is inconsistent with the Court's holding in *NLRB* v. *Marine & Shipbuilding Workers*, 391 U. S. 418 (1968).   In that case, the Court held invalid a union rule requiring the "exhaust[ion of] all remedies and appeals within the Union . . . before . . . resort to any court or other tribunal outside of the Union."   *Id.*, at 421.   The rule was enforced by the imposition of fines, without "utilizing the employer's power over the violating members' employment status."   Moreover, there was no suggestion that union members had not voluntarily agreed to be bound by the rule requiring exhaustion.

[21] In *NLRB* v. *Allis-Chalmers Mfg. Co.*, 388 U. S., at 192, the Court assumed that the proviso authorized unions to expel members and to impose fines that carry the threat of expulsion.

[22] During the House debates on the Labor-Management Reporting and Disclosure Act of 1959, 29 U. S. C. § 401 *et seq.*, it was proposed that the pending bill be amended to prohibit unions from expelling members for discriminatory reasons.   105 Cong. Rec. 15721 (1959).   The two sponsors of the bill, Representatives Landrum and Griffin, opposed this amendment on the ground that they did not seek to repeal the proviso to § 8(b)(1)(A). *Id.*, at 15722–15723.   As this Court observed in *NLRB* v. *Drivers*, 362

Accordingly, we find no basis for refusing to defer to the Board's conclusion that League Law 13 is not a "rule with respect to the retention of membership," within the meaning of the proviso.

B

The petitioners next argue that the legislative history of the Taft-Hartley Act shows that Congress made a considered decision not to protect union members' right to resign. Section 8(c) of the House bill contained a detailed "bill of rights" for labor union members. H. R. 3020, § 8(c), 80th Cong., 1st Sess., 22–26 (1947). Included was a provision making it an unfair labor practice to "deny to any [union] member the right to resign from the organization at any time." H. R. 3020, *supra*, § 8(c)(4), at 23. The Senate bill, on the other hand, did not set forth specific employee rights, but stated more generally that it was an unfair labor practice to "restrain or coerce" employees in the exercise of their § 7 rights. H. R. 3020, 80th Cong., 1st Sess., § 8(b)(1)(A), p. 81 (1947) (as passed by Senate). The Taft-Hartley Act contains the Senate bill's general language rather than the more specific House prohibitions. See 29 U. S. C. § 158(b)(1)(A). The petitioners contend that the omission of the House provision shows that Congress expressly decided not to protect the "right to resign."

The legislative history does not support this contention. The "right to resign" apparently was included in the original House bill to protect workers unable to resign because of "closed shop" agreements. Union constitutions limiting the right to resign were uncommon in 1947, see n. 12, *supra;* closed shop agreements, however, often impeded union resignations. The House Report, H. R. Rep. No. 245, 80th Cong., 1st Sess. (1947), confirms that closed shop agreements provided the impetus for the inclusion of a right to resign in

---

U. S. 274, 291 (1960): "[W]hat Congress did in 1959 does not establish what it meant in 1947. However, as another major step in an evolving pattern of regulation of union conduct, the 1959 Act is a relevant consideration."

the House bill. The Report simply states that even under the proposed legislation, employees could be required to pay dues pursuant to union security agreements. *Id.*, at 32. Because the closed shop was outlawed by the Taft-Hartley Act, see § 8(a)(3), 29 U. S. C. § 158(a)(3), it is not surprising that Congress thought it unnecessary explicitly to preserve the right to resign.

Even if § 8(c)(4) of the House bill, H. R. 3020, *supra*, was directed at restrictive union rules, its omission from the Taft-Hartley Act does not convince us that the Board's construction of § 8(b)(1)(A) is unreasonable. The House Conference Report, upon which petitioners primarily rely, does state that the specific prohibitions of § 8(c) were "omitted . . . as unfair labor practices," H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 46 (1947). But this language does not suggest that all employee rights arguably protected by the House bill were to be left unprotected. Cf. *id.*, at 43 ("[T]he primary strike for recognition . . . was not prohibited"). Apparently, the Report was intended merely to inform House Members that the detailed prohibitions of § 8(c) were not separately included in the conference bill as "unfair labor practices." We are reluctant to reach a contrary conclusion, and thereby overturn the Board's decision, on the basis of this summary statement in the House Conference Report. Congress must have been aware that the broad language of § 8(b)(1)(A) would reach some of the same union conduct proscribed by the detailed "bill of rights."[23]

---

[23] Section 8(c)(9) of the House bill, H. R. 3020, 80th Cong., 1st Sess., 25, prohibited unions from "intimidat[ing a member's] family." Although this specific provision was omitted from the Taft-Hartley Act, it is unlikely that Congress intended to protect all union conduct that § 8(c)(9) would have proscribed. Union threats against the family of a member who crossed a picket line, for example, would seem to "restrain or coerce" him in the exercise of his § 7 rights.

The dissent by JUSTICE BLACKMUN suggests that because the Senate "explicitly has rejected" the specific prohibitions in § 8(c) of the House bill, see *post*, at 121, 122, the Taft-Hartley Act leaves unregulated the relation-

Petitioners concede that "absent the legislative history," the Board's construction of § 8(b)(1)(A) would be entitled to deference. Tr. of Second Oral Arg. 15 (Apr. 1985). They argue, however, that "in this instance the legislative materials are too clearly opposed to what the Board did to permit the result the Board reached." *Id.*, at 17. We do not agree. The ambiguous legislative history upon which petitioners rely falls far short of showing that the Board's interpretation of the Act is unreasonable.[24]

## C

In *Textile Workers*, 409 U. S, at 216, and *Machinists*, 412 U. S., at 88 *(per curiam)*, the Court stated that when a union constitution does not purport to restrict the right to resign, the "law which normally is reflected in our free institutions" is applicable. Relying on this quoted language, petitioners

---

ship between a union and its members. The legislative history shows, however, that the Senate did not intend such a result. Senator Taft stated that § 8(b)(1)(A) was designed to warn unions that "they do not have the right to interfere with or coerce employees, either *their own members* or those outside their union." 93 Cong. Rec. 4025 (1947) (emphasis added).

[24] *NLRB* v. *Drivers*, 362 U. S. 274 (1960), is not controlling. There the Court held that recognitional picketing did not "restrain or coerce" employees in violation of § 8(b)(1)(A), 29 U. S. C. § 158(b)(1)(A). In so concluding, the Court relied in part on the omission from the Taft-Hartley Act of two provisions in the original House bill explicitly banning recognitional picketing. Other evidence in that case, however, was highly probative of a congressional intent to protect recognitional picketing. The desirability of restrictions on peaceful picketing was widely debated in Congress. *Id.*, at 287–288. Moreover, the Conference Report stated that "'the primary strike for recognition . . . was not prohibited.'" *Id.*, at 289, quoting H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 43 (1947). Finally, § 8(b)(4), as added by the Taft-Hartley Act, 29 U. S. C. § 158(b)(4), limits the use of other economic weapons (such as strikes and secondary boycotts) to compel recognition by an employer. See 362 U. S., at 282–284. It is clear that a compromise was reached by the 1947 Congress; recognitional picketing was to be allowed, while the use of other economic weapons to compel recognition was curtailed. There is no evidence of such a compromise with respect to the "right to resign."

argue that League Law 13 is valid. They assert that because the common law does not prohibit restrictions on resignation,[25] such provisions are not violative of § 8(b)(1)(A) of the Act. We find no merit in this argument. *Textile Workers, supra,* and *Machinists, supra,* held only that in the absence of restrictions on the right to resign, members are free to leave the union at any time. Although the Court noted that its decisions were consistent with the common-law rule, it did not state that the validity of restrictions on the right to resign should be determined with reference to common law.

The Court's decision in *NLRB* v. *Marine & Shipbuilding Workers,* 391 U. S. 418 (1968), demonstrates that many union rules, although valid under the common law of associations, run afoul of § 8(b)(1)(A) of the Act.[26] There the union ex-

---

[25] It is at least open to question whether all restrictions on the right to resign are valid under the "common law of associations." See, *e. g., Haynes* v. *Annandale Golf Club,* 4 Cal. 2d 28, 47 P. 2d 470 (1935) (a bylaw purporting to allow the association to deny a member's right of resignation by merely withholding its consent is invalid because unreasonable and arbitrary). Our conclusion that the common law is irrelevant makes it unnecessary to resolve this question.

[26] JUSTICE BLACKMUN's dissent suggests that the relationship between a union and its members should be governed by contract law. *Post,* at 119. The rationale of this theory is that a member, by joining the union, "enters into a contract, the terms of which are expressed in the union constitution and by-laws." Summers, Legal Limitations on Union Discipline, 64 Harv. L. Rev. 1049, 1054 (1951). *Marine Workers* shows, of course, that union discipline cannot be analyzed primarily in terms of the common law of contracts.

The dissent repeatedly refers to the "promise" made by the employees involved in this case. *Post,* at 129. Because they were members of the union when League Law 13 was adopted, the dissent reasons that the employees "promised" not to resign during a strike. But the "promise" to which the dissent refers is unlike any other in traditional contract law. As a commentator has recognized:

"Membership in a union contemplates a continuing relationship with changing obligations as the union legislates in monthly meetings or in annual conventions. It creates a complex cluster of rights and duties

pelled a member who failed to comply with a rule requiring the "exhaust[ion of] all remedies and appeals within the Union . . . before . . . resort to any court or other tribunal outside of the Union." *Id.*, at 421. Under the common law, associations may require their members to exhaust all internal remedies. See, *e. g., Medical Soc. of Mobile Cty.* v. *Walker*, 245 Ala. 135, 16 So. 2d 321 (1944). Nevertheless, the *Marine Workers* Court held that "considerations of public policy" mandated a holding that the union rule requiring exhaustion violated § 8(b)(1)(A), 29 U. S. C. § 158(b)(1)(A). 391 U. S., at 424; see also *Scofield* v. *NLRB*, 394 U. S., at 430 (union rule is invalid under § 8(b)(1)(A) if it "impairs [a] policy Congress has imbedded in the labor laws").

The Board reasonably has concluded that League Law 13 "restrains or coerces" employees, see § 8(b)(1)(A), and is inconsistent with the congressional policy of voluntary unionism. Therefore, whatever may have been the common law, the Board's interpretation of the Act merits our deference.

## V

The Board has the primary responsibility for applying " 'the general provisions of the Act to the complexities of industrial life.' " *Ford Motor Co.* v. *NLRB*, 441 U. S. 488, 496 (1979), quoting *NLRB* v. *Erie Resistor Corp.*, 373 U. S. 221, 236 (1963), in turn citing *NLRB* v. *Steelworkers*, 357 U. S. 357, 362–363 (1958). Where the Board's construction of the Act is reasonable, it should not be rejected "merely because the courts might prefer another view of the statute." *Ford Motor Co.* v. *NLRB, supra,* at 497. In this case, two factors suggest that we should be particularly reluctant to hold that the Board's interpretation of the Act is impermissible.

---

expressed in a constitution. In short, membership is a special relationship. It is as far removed from the main channel of contract law as the relationships created by marriage, the purchase of a stock certificate, or the hiring of a servant."

Summers, *supra,* at 1055–1056.

First, in related cases this Court invariably has yielded to Board decisions on whether fines imposed by a union "restrain or coerce" employees.[27]  Second, the Board consistently has construed § 8(b)(1)(A) as prohibiting the imposition of fines on employees who have tendered resignations invalid under a union constitution.[28]  Therefore, we conclude that the Board's decision here is entitled to our deference.

## VI

The Board found that by fining employees who had tendered resignations, the petitioners violated § 8(b)(1)(A) of the

---

[27] In holding that unions may impose fines against members who return to work during a strike, the Court in *NLRB* v. *Allis-Chalmers Mfg. Co.,* 388 U. S. 175 (1967), "essentially accepted the position of the National Labor Relations Board." *Scofield* v. *NLRB,* 394 U. S. 423, 428 (1969). In *Scofield,* the Court deferred to the Board's ruling that § 8(b)(1)(A) does not prohibit unions from fining members who accept daily wages in excess of a union-imposed ceiling.  Four years later, the Court again relied on the Board in holding that § 8(b)(1)(A) has nothing to say about whether union fines are "reasonable" in amount.  *NLRB* v. *Boeing Co.,* 412 U. S. 67 (1973).  Finally, in *NLRB* v. *Textile Workers,* 409 U. S. 213 (1972), and *Machinists* v. *NLRB,* 412 U. S. 84 (1973) *(per curiam),* the Court deferred to the Board's conclusion that § 8(b)(1)(A) prohibits unions from fining former members who have resigned lawfully.

[28] In *United Automobile, Aerospace & Agricultural Implement Workers, Local 647 (General Electric Co.),* 197 N. L. R. B. 608 (1972), the Board held that § 8(b)(1)(A) prohibits a union from fining employees who have resigned, even when a provision in the union constitution purports to make the resignations invalid.  There two employees resigned during a strike and returned to work.  Their resignations were ineffective under a union constitutional provision permitting resignations only during the last 10 days of the union's fiscal year.  The Board nevertheless held that the employees could not be fined for crossing the picket line.  It noted that imposing fines on these employees was inconsistent with *Scofield* v. *NLRB, supra,* for they effectively were denied "a voluntary method of severing their relationship with the Union."  197 N. L. R. B., at 609.  The Board reached the same conclusion in *United Automobile, Aerospace & Agricultural Implement Workers, Local 469 (Master Lock Co.),* 221 N. L. R. B. 748 (1975).  See also *Local 1384, United Automobile, Aerospace & Agricultural Implement Workers (Ex-Cell-O Corp.),* 219 N. L. R. B. 729 (1975).

Act, even though League Law 13 purported to render the resignations ineffective. We defer to the Board's interpretation of the Act and so affirm the judgment of the Court of Appeals enforcing the Board's order.

*It is so ordered.*

JUSTICE WHITE, concurring.

I agree with the Court that the Board's construction of §§ 7 and 8(b)(1)(A) is a permissible one and should be upheld. The employee's rights under § 7 include, among others, the right to refrain from joining or assisting a labor organization and from engaging in concerted activities for mutual aid or protection. The right to join or not to join a labor union includes the right to resign, and § 8(b)(1)(A) forbids unions to interfere with that right except to the extent, if any, that such interference is permitted by the proviso to that section, which preserves the union's right to prescribe its own rules with respect to the acquisition or retention of membership. The proviso might be read as permitting restrictions on resignation during a strike, since they would seem to relate to the "retention" of membership. But it can also be sensibly read to refer only to the union's right to determine who shall be allowed to join and to remain in the union. The latter is the Board's interpretation. Under that view, restrictions on resignations are not saved by the proviso, and the rule at issue in this case may not be enforced.

For the Act to be administered with the necessary flexibility and responsiveness to "the actualities of industrial relations," *NLRB* v. *Steelworkers*, 357 U. S. 357, 362–364 (1958), the primary responsibility for construing its general provisions must be with the Board, and that is where Congress has placed it. "[W]e should 'recognize without hesitation the primary function and responsibility of the Board'" to apply these provisions to particular, and often complex, situations. *Ford Motor Co.* v. *NLRB*, 441 U. S. 488, 496 (1979), quoting *NLRB* v. *Insurance Agents*, 361 U. S. 477, 499 (1960).

Where the statutory language is rationally susceptible to contrary readings, and the search for congressional intent is unenlightening, deference to the Board is not only appropriate, but necessary.

This is such a case. The Board has adopted a sensible construction of the imprecise language of §§ 7 and 8 that is not negated by the legislative history of the Act. That Congress eliminated from the bill under consideration a provision that would have made certain restrictions on resignation unfair labor practices falls short of indicating an intention to foreclose the Board's reading. By the same token, however, there is nothing in the legislative history to indicate that the Board's interpretation is the only acceptable construction of the Act, and the relevant sections are also susceptible to the construction urged by the union in this case. Therefore, were the Board arguing for that interpretation of the Act, I would accord its view appropriate deference.

Because I do not understand it to be inconsistent with the foregoing views, I join the Court's opinion.

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

Today the Court supinely defers to a divided-vote determination by the National Labor Relations Board that a union commits an unfair labor practice when it enforces a worker's promise to his fellow workers not to resign from his union and return to work during a strike, even though the worker freely made the decision to join the union and freely made the promise not to resign at such a time, and even though union members democratically made the decision to strike in full awareness of that promise. The Court appears to adopt the NLRB's rule that enforcement of any such promise, no matter how limited and no matter how reasonable, violates the breaching worker's right to refrain from concerted activity. The Board's rule, however, finds no support in either the lan-

guage of §§ 7 and 8(b)(1)(A) of the National Labor Relations Act on which the Court purports to rely, or in the general goals of the Act, which it ignores.  Accordingly, the undeserved deference accorded that rule has produced a holding that improperly restricts a union's federally protected right to make and enforce its own rules, and at the same time traduces the broader aim of federal labor policy implicated by this right: to preserve the balance of power between labor and management by guaranteeing workers an effective right to strike.

## I

## A

Having determined that the individual worker standing alone lacked sufficient bargaining power to achieve a fair agreement with his employer over the terms and conditions of his employment, Congress passed the NLRA in order to protect employees' rights to join together and act collectively.  See 29 U. S. C. § 151.  Thus, the heart of the Act is the protection of workers' § 7 rights to self-organization and to free collective bargaining, which are in turn protected by § 8 of the Act.  29 U. S. C. §§ 157 and 158.

Because the employees' power protected in the NLRA is the power to act collectively, it has long been settled that the collective has a right to promulgate rules binding on its members, so long as the employee's decision to become a member is a voluntary one and the rules are democratically adopted.  When these requirements of free association are met, the union has the right to enforce such rules "through reasonable discipline," including fines.  See *NLRB* v. *Allis-Chalmers Mfg. Co.*, 388 U. S. 175, 181 (1967).  Unless internal rules can be enforced, the union's status as bargaining representative will be eroded, and the rights of the members to act collectively will be jeopardized.  *Ibid.*  "Union activity, by its very nature, is group activity, and is grounded on the notion that strength can be garnered from unity, solidar-

ity, and mutual commitment. This concept is of particular force during a strike, where the individual members of the union draw strength from the commitments of fellow members, and where the activities carried on by the union rest fundamentally on the mutual reliance that inheres in the 'pact.'" *NLRB* v. *Textile Workers*, 409 U. S. 213, 221 (1972) (dissenting opinion); see *Allis-Chalmers*, 388 U. S., at 181.

It is in the proviso to § 8(b)(1)(A), 29 U. S. C. § 158(b)(1)(A), that Congress preserved for the union the right to establish "the contractual relationship between union and member." *Textile Workers*, 409 U. S., at 217. Recognizing "the law which normally is reflected in our free institutions," *id.*, at 216, Congress in the proviso preserved a union's status as a voluntary association free to define its own membership. The proviso states that the creation of a union unfair labor practice for a violation of the workers' right to refrain from collective action does not "impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein." 29 U. S. C. § 158(b)(1)(A). As the Court has recognized previously and now concedes, the legislative history indicates that the proviso was meant to ensure that the employees' "right to refrain" would not be understood "to interfere with the internal affairs or organization of unions." *Ante*, at 102, quoting *Allis-Chalmers*, 388 U. S., at 187, in turn quoting 93 Cong. Rec. 4272 (1947) (statement of Sen. Ball). The "right to refrain" simply "was not intended to give the Board power to regulate internal union affairs, including the imposition of disciplinary fines, with their consequent court enforcement, against members who violate the unions' constitutions and bylaws." *NLRB* v. *Boeing Co.*, 412 U. S. 67, 71 (1973). See also *Scofield* v. *NLRB*, 394 U. S. 423, 428 (1969).

Sensitive to both the Act's central goal of facilitating collective action, and the Taft-Hartley Act's protection against coercion of employees, the Court previously has interpreted the proviso to distinguish between two kinds of union rules.

Reasonable union rules that represent obligations voluntarily incurred by members were intended to be free from federal regulation under § 8, while union rules that seek to coerce an employee by utilizing the employer's power over his employment status, or otherwise compel him to take on duties or join in concerted activities he never consented to, were intended to be subject to regulation by the Board. Because rules that regulate the relationship between the union and his employer could be used to coerce an employee into becoming involved with the union in order to protect his job, such rules would impair the employee's free association rights. "[T]he repeated refrain throughout the debates on § 8(b)(1)(A) and other sections [was] that Congress did not propose any limitations with respect to the internal affairs of unions, aside from barring enforcement of a union's internal regulations to affect a member's employment status." *Allis-Chalmers*, 388 U. S., at 195. The proviso was designed "to make it clear that . . . [a]ll we are trying to cover [in § 8] is the coercive and restraining acts of the union in its efforts to organize unorganized employees." 93 Cong. Rec. 4433 (1947) (statement of Sen. Ball). Until today, the Court has rejected the proposition that the proviso does not protect a union rule merely because the rule has an impact beyond the confines of the labor organization, *Scofield*, 394 U. S., at 431–432, or because it is not a rule about the expulsion of members. Cf. *ante*, at 108–110.

League Law 13 is an internal union rule, a "rule with respect to the acquisition or retention of membership" protected by the proviso to § 8(b)(1)(A). It requires that employees who freely choose to join the union promise to remain members during a strike or lockout, as well as during the time when a strike or lockout appears imminent. In other words, the rule imposes a condition upon members of the bargaining unit who would like to acquire membership rights. The rule stands for the proposition that to become a union member one must be willing to incur a certain obligation upon

which others may rely; as such, it is a rule literally involving the acquisition and retention of membership. Conversely, League Law 13 does not in any way affect the relationship between the employee and the employer. An employee who violates the rule does not risk losing his job, and the union cannot seek an employer's coercive assistance in collecting any fine that is imposed. The rule neither coerces a worker to become a union member against his will, nor affects an employee's status as an employee under the Act. Thus, it clearly falls within the powers of any voluntary association to enact and enforce "the requirements and standards of membership in the union itself," so as to permit the association effectively to pursue collective goals. 93 Cong. Rec. 4433 (1947) (remarks of Sen. Ball).

## B

The Court nonetheless finds that League Law 13 violates an employee's right to refrain from collective activity and is not protected by the proviso. It reaches this conclusion by giving the proviso a cramped reading as a provision protecting only rules concerning the expulsion of members, see *ante*, at 108–110, ignoring in the process both the plain meaning and the legislative history of the proviso. Further, the Court never addresses the fact that the rule is a prerequisite of union membership much like any other internal union rule. Indeed, the Court entirely fails to explain why League Law 13 is *not* a rule "with respect to the acquisition or retention of membership," even given its own enervating understanding of the proviso. The rule, after all, is one to which a member was obliged to agree when he acquired or decided to retain membership in the union.

Moreover, Congress explicitly has rejected the Court's interpretation of §§ 7 and 8(b)(1)(A). The "right to refrain" language upon which the Court relies was contained in § 7(a) of the House version of the Act, H. R. 3020, 80th Cong., 1st Sess. (1947) (House bill). Section 7 of the House bill was

divided into subsection (a), granting "employees" the right to refrain from concerted activity, and subsection (b), granting "[m]embers of any labor organization" rights concerning the "affairs of the organization." Corresponding to these provisions were § 8(b), which made it an unfair labor practice for anyone to interfere with an employee's § 7(a) rights, and § 8(c), which made it an unfair labor practice to interfere with an employee's § 7(b) rights. In particular, § 8(c) created a bill of rights for union members in their dealings with their union, establishing 10 unfair labor practices which regulated the major facets of the member-union relationship. Among these specifically enumerated rights was § 8(c)(4), which made it an unfair labor practice "to deny to any member the right to resign from the organization at any time."

Thus, the House regarded the "right to refrain" of § 7(a) as the right not to join in union activity, making it illegal for "representatives and their partisans and adherents to harass or abuse employees into joining labor organizations." H. R. Rep. No. 245, 80th Cong., 1st Sess., 30 (1947). And the House believed that § 7(b) and § 8(c) of its bill, which included a proscription of internal rules concerning a member's right to resign, regulated the member-union relationship. There is no suggestion that the House considered the right to refrain to include the right to abandon an agreed-upon undertaking at will, nor to relate to the rights against the union protected by §§ 7(b) and 8(c) of the House bill, including the right to resign at will. Rather, these distinct rights arose from separate sections of the House bill.

It is critical to an understanding of the Taft-Hartley bill, therefore, to recognize that the Senate explicitly *rejected* the House bill's §§ 7(b) and 8(c). It did so not, as the Court intimates, because it considered the specific provisions of §§ 7(b) and 8(c) to encompass the "right to refrain" language adopted from § 7(a), but because it decided that "the formulation of a code of rights for individual members of trade unions . . . should receive more extended study by a special joint con-

gressional committee." S. Rep. No. 105, 80th Cong., 1st Sess., 2 (1947). Senator Taft's summary of the bill provides a clear and nonmysterious explanation of the Senate's stance on regulation of the union-member relationship:

"In the House bill union initiation fees were among 10 provisions providing for certain rights and immunities of members of labor organizations against arbitrary action by the officers of a union to which they belonged. This was the so-called bill of rights subsection in the House bill. The Senate conferees refused to agree to the inclusion of this subsection in the conference agreement since they felt that it was unwise to authorize an agency of the Government to undertake such elaborate policing of the internal affairs of unions as this section contemplated without further study of the structure of unions." 93 Cong. Rec. 6443 (1947).

And the House Conference Report, though reflecting the understatement of the vanquished, is equally clear:

"Section 8(c) of the House bill contained detailed provisions dealing with the relations of labor organizations with their members. One of the more important provisions of this section—[involving initiation fees in union shops]—is included in the conference agreement . . . and has already been discussed. The other parts of this subsection are omitted from the conference agreement as unfair labor practices. . . ." H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 46 (1947).

In the face of this substantial legislative history indicating that the House provisions were rejected on the merits, the Court's treatment of that history, see *ante*, at 111, is both inaccurate and inadequate.[1]

---

[1] Moreover, any claim that the language of § 8(b)(1)(A) as enacted is broad enough to allow the Board to find in it a prohibition on union rules governing the right to resign ignores the fact that the Senate also rejected

Not surprisingly, the Court reaches for an alternative explanation as to why the "right to resign" provision was omitted from the Taft-Hartley amendments. We are told that the "right to resign" provision was omitted from the bill because the House, having won a provision making the closed shop illegal, was willing to give in on the right to resign. *Ante*, at 110–111. If this indeed explains the House's actions, its concession merely reinforces what the rest of the legislative history makes explicit: that the Senate was willing to agree to proscribe the closed shop and union shop because it agreed that they improperly coerced an employee into becoming a union member in order to keep his job. But the Senate was not willing to impose conditions on the contractual relationship between the union and its members, including a rule giving members a right to resign at will, insofar as such regulation did not affect the employment relationship. The House may have thought that the closed shop rules and the rules regulating the internal affairs of unions were similar rules aimed at preventing a union from limiting the freedom of choice of employees in what it considered impermissible ways. Drawing a different distinction, the Senate less narrowly circumscribed union discretion: rules that coerced an employee into taking collective action against his will by threatening his employment rights were prohibited, while rules that were a prerequisite of acquisition or retention of membership were to be left unregulated for the time being. Perhaps the House believed that the proscription against the closed shop and the proscription on limitations on a member's right to resign were aimed at the same evil. But the Senate obviously did not, and it prevailed.

---

the House's broader version of *that* section that at least would have lent some support for that assertion. In particular, the Senate rejected the House's proscription on union efforts "by intimidating practices . . . to compel or seek to compel any individual to become *or remain* a member of any labor organization." See H. R. 3020, 80th Cong., 1st Sess., § 8(b)(1) (1947) (emphasis added).

The Court thus faces the same situation it addressed when it rejected the Board's interpretation of the recognitional-picketing provisions of the Act in *NLRB* v. *Drivers*, 362 U. S. 274 (1960) *(Curtis Bros.)*. "Plainly, the [union's] conduct in the instant case would have been prohibited if the House bill had become law. . . . But the House conferees abandoned the House bill in conference and accepted the Senate proposal." *Id.*, at 289. As in *Curtis Bros.*, it is therefore appropriate to recall that

> "'the Taft-Hartley Act was, to a marked degree, the result of conflict and compromise between strong contending forces and deeply held views on the role of organized labor in the free economic life of the Nation. . . . This is relevant in that it counsels wariness in finding by construction a broad policy . . . as such when, from the words of the statute itself, it is clear that those interested in just such a condemnation were unable to secure its embodiment in enacted law.'" *Id.*, at 289–290, quoting *Carpenters* v. *NLRB*, 357 U. S. 93, 99–100 (1958).

Here, too, the legislative history "strongly militates against a judgment that Congress intended a result that it expressly declined to enact." *Gulf Oil Corp.* v. *Copp Paving Co.*, 419 U. S. 186, 200 (1974).[2]

The Court also attempts to justify its result by suggesting that League Law 13 impairs a federal labor policy mandating "voluntary unionism" implicit in § 8(a)(3) of the Act, and thus

---

[2] The Court finds *Curtis Bros.* not controlling because there was evidence in that case that a compromise had been reached between the House and the Senate as regards restrictions on peaceful picketing. See *ante*, at 112, n. 24. Today the Court finds "no evidence of such a compromise with respect to the 'right to resign.'" *Ibid.* The Court is correct: there was no compromise because the Conference rejected entirely the House's attempt to regulate internal union affairs in the Taft-Hartley Act. I am not persuaded that it is more acceptable for the Court to adopt a rule entirely rejected by Congress than to adopt one that was rejected as part of a compromise.

is unenforceable under § 8(a)(1) of the Act. See *ante*, at 104, quoting *Scofield*, 394 U. S., at 430. Thus, the Court says, for the same reason that Congress determined that the closed shop should be prohibited as a violation of an employee's right to refrain from concerted activity, a promise not to leave the union during a strike should not be enforceable. Both rules, the Court intimates, "protec[t] the employment rights of the dissatisfied member." *Ante,* at 106.

The Court, however, again ignores the distinction between internal and external rules fashioned in its prior cases, and so misunderstands the concept of "voluntary unionism" implicated by the Act. The purpose of the union unfair labor practice provisions added to § 8(a)(3) was to "preven[t] the union from inducing the employer to use the emoluments of the job to enforce the union's rules." *Scofield,* 394 U. S., at 429. By outlawing the closed shop and the union shop Congress ensured that a union's disciplinary rules can have no effect on the employment rights of the member, and so cannot impinge upon the policy of voluntary unionism protected by § 8(a)(3) of the Act.

The proviso serves a fundamentally different purpose—to make manifest that § 8 did not grant the Board the authority to impair the basic right of all membership associations to establish their own reasonable membership rules. League Law 13 is such a rule. It binds members to a reciprocal promise not to resign and return to work during a strike. It does not involve use of the employer's power or affect an individual's employment status, and so does not implicate § 8(a)(3). A member who violates the union rule may be fined, or even expelled from the union, but his employment status remains unaffected. Despite the Court's suggestions to the contrary, "voluntary unionism" does not require that an employee who has freely chosen to join a union and retain his membership therein, in full knowledge that by those decisions he has accepted specified obligations to other members, nevertheless has a federally protected right to disre-

gard those obligations at will, regardless of the acts of others taken in reliance on them.[3]

At bottom, the Court relies on an unspoken concept of voluntary unionism that, carried to its extreme, would deny to the union member—in the name of having his participation in the union be voluntary—the right to make any meaningful promise to his co-workers. The Court understands voluntariness to mean freedom from enforceable commitment, treating the union member as a juvenile or incompetent whose promise may not be enforced against him because it is presumed not to have been made with awareness of the consequences of the promise. Not only is the Court's paternalism misplaced and offensive to the member, but it threatens the power to act collectively that is at the center of the Act.

## II

Congress' decision not to intervene in the internal affairs of a union reflects Congress' understanding that membership in a union—if not a precondition for one's right to employment—is a freely chosen membership in a voluntary association. The Court therefore has looked to "the law which

---

[3] The Court's response is that a right to fine a member is an infringement on a worker's employment rights. It reasons, apparently, that because workers work for money and fines are exacted in the same currency, a fine permits a union to take away what the worker gains in employment. See *ante*, at 106–107. This, of course, is to say that *any* fine imposed for a violation of an internal union rule violates a member's employment rights, a proposition explicitly rejected in both *NLRB* v. *Allis-Chalmers Mfg. Co.*, 388 U. S. 175 (1967), and *Scofield* v. *NLRB*, 394 U. S. 423 (1969). The Court's reasoning is obviously circular: enforcement of a union rule prohibiting resignation during a strike is different from enforcement of other union rules because it violates policies of voluntary unionism. It violates those policies because it works an infringement on employment rights. It works an infringement on employment rights because it imposes fines. And these fines are impermissible while fines for violation of other union rules are appropriate because—the rule here violates voluntary unionism.

normally is reflected in our free institutions" to determine whether any given membership rule is lawful. *NLRB* v. *Textile Workers*, 409 U. S., at 216. And the common law of associations establishes that an association may place reasonable restrictions on its members' right to resign where such restrictions are designed to further a basic purpose for which the association was formed[4]—here, where the restriction "reflects a legitimate union interest." *Scofield*, 394 U. S., at 430. The Pattern Makers evidently promulgated League Law 13 to protect the common interest in maintaining a united front during an economic strike. Such a rule protects individual union members' decisions to place their own and their families' welfare at risk in reliance on the reciprocal decisions of their fellow workers, and furthers the union's ability to bargain with the employer on equal terms, as envisioned by the Act. As such, the rule comports with the broader goals of federal labor policy, which guarantees workers the right to collective action and, in particular, the right to strike.

Specifically, Congress has mandated that nothing in the Act, including the "right to refrain" relied upon by the Court today, "shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right." 29 U. S. C. § 163. The strike or the threat to strike is the workers' most effective means of pressuring employers, and so lies at the center of the collective activity protected by the Act. "The economic strike against the employer is the ultimate weapon in labor's arsenal for achieving agreement upon its terms." *Allis-Chalmers*, 388 U. S., at 181. Consequently, the Court

---

[4] See, *e. g., Troy Iron and Nail Factory* v. *Corning*, 45 Barb. 231, 256–257 (N. Y. Sup. Ct. 1864); *Leon* v. *Chrysler Motors Corp.*, 358 F. Supp. 877, 886–888 (NJ 1973), affirmance order, 474 F. 2d 1340 (CA3 1974). See also Note, A Union's Right to Control Strike-Period Resignations, 85 Colum. L. Rev. 339, 354–355, and nn. 107–110 (1985) (Columbia Note).

has recognized that "'[t]he power to fine or expel strike-breakers is essential if the union is to be an effective bargaining agent.'" *Ibid.*, quoting Summers, Legal Limitations on Union Discipline, 64 Harv. L. Rev. 1049 (1951).

To be effective, the decision to strike, like the decision to bargain collectively, must be respected by the minority until democratically revoked. The employees' collective decision to strike is not taken lightly, and entails considerable costs. See *NLRB* v. *Mackay Radio & Tel. Co.*, 304 U. S. 333, 345 (1938) (employer has right permanently to replace workers on economic strike). Before workers undertake such a course, it is reasonable that they have some assurance that collectively they will have the means to withstand the pressures the employer is able lawfully to impose on them. A voluntarily and democratically adopted rule prohibiting resignations during a strike is one such means. By ensuring solidarity during a strike, it enforces the union's "legitimate interest in presenting a united front . . . and in not seeing its strength dissipated and its stature denigrated by subgroups within the unit separately pursuing what they see as separate interests." *Emporium Capwell Co.* v. *Western Addition Community Organization*, 420 U. S. 50, 70 (1975).

Once an employee freely has made the decision to become a member of the union, has agreed not to resign during a strike, and has had the opportunity to participate in the decision to strike, his faithfulness to his promise is simply the *quid pro quo* for the benefits he has received as a result of his decision to band together with his fellow workers and to join in collective bargaining. For the dissatisfied member to return to work in violation of his promise, while his fellows remain on strike—forgoing their wages and risking their jobs in a now-weakened effort to pressure the employer into making concessions—is to allow the breaching individual to become a free rider, enjoying the benefits of his bargain without having to live with the risks that all who sought those benefits agreed to share.

More perniciously, a dissenting individual's decision to return to work predictably could have a snowballing effect, as apparently it did in this case, causing the strike to lose its effectiveness even though the majority of workers, having commenced collective action in reliance on a now-breached promise of solidarity, would wish to continue that action. It is hardly inconsistent with federal labor policy to enact a rule to ensure that the collective decision to remain out on strike be revocable only by procedures agreed upon collectively, not by the decision of a few dissenting individuals who believe it is in their individual interests to return to work, breaking the promise they made to abide by the majority's will. In a strike setting, therefore, "[t]he mutual reliance of his fellow members who abide by the strike for which they have all voted outweighs . . . the admitted interests of the individual who resigns to return to work." *NLRB* v. *Textile Workers*, 409 U. S., at 223 (dissenting opinion).

Enforcement of a promise not to resign during a strike, then, is not a limitation of a §7 right, but is a vindication of that right to act collectively and engage in collective bargaining, so long as the promise is voluntarily made. It is a way to effectuate "'[t]he majority-rule concept [that] is today unquestionably at the center of our federal labor policy.'" *Allis-Chalmers*, 388 U. S., at 180, quoting Wellington, Union Democracy and Fair Representation: Federal Responsibility in a Federal System, 67 Yale L. J. 1327, 1333 (1958). As such, League Law 13 is a condition on union membership that a union might reasonably impose to advance its legitimate ends, and so is an internal union rule protected by the proviso preserving a union's right to enact reasonable rules defining the conditions of union membership.

## III

In sum, the Court defers to the Board although the Board's position cannot fairly be said to rest on any principled application of the policies of our national labor laws. Because

a majority of the Board has interpreted the terms of the NLRA in a manner inconsistent with the congressional purpose clearly expressed in the legislative scheme and amply documented in the legislative history, the Court's deference is misplaced. "The deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress." *American Ship Building Co.* v. *NLRB*, 380 U. S. 300, 318 (1965). We are not here "to stand aside and rubber-stamp . . . administrative decisions that [are] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *NLRB* v. *Brown*, 380 U. S. 278, 291–292 (1965). See also *Chemical Workers* v. *Pittsburgh Plate Glass Co.*, 404 U. S. 157, 166 (1971); 5 U. S. C. §§ 706(2)(A) and (C).

## IV

The Court previously has recognized that it violates precepts of voluntary unionism to bind a member to promises he did not knowingly make. See *Machinists* v. *NLRB*, 412 U. S. 84, 89 (1973). The Board therefore properly could prevent enforcement of a rule like League Law 13 if there were evidence that the members were not aware of the provision until they had lost the ability to escape its force. *Id.*, at 91 (opinion concurring in judgment). Though the § 7 right not to participate may be waived, as it was here, see *Metropolitan Edison Co.* v. *NLRB*, 460 U. S. 693, 705 (1983); *Allis-Chalmers*, 388 U. S., at 180; *Mastro Plastics Corp.* v. *NLRB*, 350 U. S. 270, 280 (1956), a waiver "must be clear and unmistakable." *Metropolitan Edison Co.* v. *NLRB*, *supra*, at 708. The Court for that reason has agreed with the Board that it is an unfair labor practice for a union to attempt to collect a fine against a member who resigned from the union during a strike when it was not made explicit to the member that as a condition of membership he had to agree

not to resign during the strike. See *Machinists* v. *NLRB, supra.*[5]

There is no similar suggestion in the record before us that the union members here were unaware of the promises they had made to their fellow members. If the dissenting members disagreed either with the decision to enact League Law 13, or with the decision to strike, they were free to try to influence their colleagues to their view. If they did not agree with the enactment of League Law 13, they were free as well to resign from the union when the rule was promulgated over their objection. Once the strike had begun, if they believed that the union officers were no longer acting in their best interest, they were free to try to convince their colleagues to end the strike, to replace their leaders, or even to decertify their union. See *Allis-Chalmers*, 388 U. S., at 191. Having failed to persuade the majority to their view, they should not be free to break their promise to their fellow workers.

---

[5] See Gould, Solidarity Forever—Or Hardly Ever: Union Discipline, Taft-Hartley, and the Right of Union Members to Resign, 66 Cornell L. Rev. 74, 106–114 (1980); Columbia Note 366–367.

The principle that free associations may make rules to further the ends of the association, guaranteed to unions in the proviso, does not necessarily protect any kind of internal union rule that implicates a worker's right to refrain from collective action. For example, a union rule that impinged on a member's right to refrain from collective activity but furthered none of the purposes of collective action and self-organization protected by the labor law would not fit comfortably within the proviso. See *id.*, at 367–369; cf. *Local 1384, UAW*, 227 N. L. R. B. 1045 (1977) (rule allowing members to resign in a 10-day period once a year illegitimate because it does not vindicate any legitimate union interest). Thus in *NLRB* v. *Marine Workers*, 391 U. S. 418 (1968), the Court held invalid an internal union rule that denied members access to the NLRB because the rule violated policies of speedy access to the Board implicated by § 10(b) of the Act, 29 U. S. C. § 160(b), and attempted to further policies "beyond the legitimate interests of a labor organization." 391 U. S., at 424. The Court today inconsistently labels this standard "illusory," *ante*, at 108, n. 19, and then inaccurately chastises the dissent for not following it. *Ante*, at 109, n. 20.

"[T]he principle of fidelity to one's word is an ancient one." C. Fried, Contract As Promise 2 (1981). The assumption that one's freedom has been limited by being held to one's freely made bargain is as misguided in the context of the labor law as when stated as a general principle. By focusing exclusively on the right to refrain from collective action, by assuming an arid and artificial conception of the proviso circumscribing that right, and by ignoring Congress' intentions in promulgating the NLRA in the first instance, the Board and the Court abandon their proper role as mediators between any conflicting interests protected by the labor laws. In the name of protecting individual workers' rights to violate their contractual agreements, the Court debilitates the right of all workers to take effective collective action. The conclusion that freedom under the NLRA means freedom to break a freely made promise to one's fellow workers after they have relied on that promise to their detriment is not only a notion at odds with the structure and purpose of our labor law, but is an affront to the autonomy of the American worker. I dissent.

JUSTICE STEVENS, dissenting.

The legislative history of the Labor-Management Relations Act, 1947, discussed in Part I–B of JUSTICE BLACKMUN's dissenting opinion, coupled with the plain language in the proviso to § 8(b)(1)(A), persuades me that the "right to refrain" protected by § 7 of the Act does not encompass the "right to resign." Accordingly, I respectfully dissent.