# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

---

SAGINAW EDUCATION ASSOCIATION,

        Respondent-Appellant/Cross-
        Appellee,

v

KATHY EADY-MISKIEWICZ,

        Charging Party-Appellee/Cross-
        Appellant.

FOR PUBLICATION
May 2, 2017
9:00 a.m.

No. 329419
MERC
LC No. 13-013125

---

MICHIGAN EDUCATION ASSOCIATION,

        Respondent-Appellant/Cross-
        Appellee,

v

KATHY EADY-MISKIEWICZ,

        Charging Party-Appellee/Cross-
        Appellant.

No. 329425
MERC
LC No. 13-013127

---

SAGINAW EDUCATION ASSOCIATION,

        Respondent-Appellant/Cross-
        Appellee,

v

MATT KNAPP,

        Charging Party-Appellee/Cross-
        Appellant.

No. 329426
MERC
LC No. 13-013128

---

MICHIGAN EDUCATION ASSOCIATION,

Respondent-Appellant/Cross-
Appellee,

v

MATT KNAPP,

      Charging Party-Appellee/Cross-
Appellant.

No.  329427
MERC
LC No.  13-013129

SAGINAW EDUCATION ASSOCIATION,

      Respondent-Appellant/Cross-
Appellee,

v

JASON LAPORTE,

      Charging Party-Appellee/Cross-
Appellant.

No.  329428
MERC
LC No.  13-013130

MICHIGAN EDUCATION ASSOCIATION,

      Respondent-Appellant/Cross-
Appellee,

v

JASON LAPORTE,

      Charging Party-Appellee/Cross-
Appellant.

No.  329429
MERC
LC No.  13-013131

SAGINAW EDUCATION ASSOCIATION,

      Respondent-Appellant/Cross-
Appellee,

v

SUSAN ROMSKA,

No.  329430
MERC
LC No.  13-013132

-2-

Charging Party-Appellee/Cross-
Appellant.

---

MICHIGAN EDUCATION ASSOCIATION,

Respondent-Appellant/Cross-
Appellee,

v

SUSAN ROMSKA,

Charging Party-Appellee/Cross-
Appellant.

No. 329431
MERC
LC No. 13-013134

---

STANDISH-STERLING EDUCATIONAL
SUPPORT PERSONNEL ASSOCIATION
MEA/NEA,

Respondent-Appellant,

v

MARK NORGAN,

Charging Party-Appellee.

No. 331398
MERC
LC No. 14-002293

---

GRAND BLANC CLERICAL ASSOCIATION
and MICHIGAN EDUCATION ASSOCIATION,

Respondents-Appellants,

v

MARY CARR,

Charging Party-Appellee.

No. 331762
MERC
LC No. 14-006843

---

BATTLE CREEK EDUCATIONAL
SECRETARIES ASSOCIATION and MICHIGAN
EDUCATION ASSOCIATION,

Respondents-Appellants,

v                                                                    No. 331875
                                                                     MERC
ALPHIA SNYDER,                                                       LC No. 14-004413

Charging Party-Appellee.

Before: BECKERING, P.J., and O'CONNELL and SWARTZLE, JJ.

PER CURIAM.

These consolidated appeals mainly concern the effects of legislative modifications of the public employment relations act (PERA), MCL 423.201 *et seq.*, since 2012—the legislation transforming Michigan into a so-called right-to-work state.

In Docket Nos. 329419, 329425, 329426, 329427, 329428, 329429, 329430, and 329431, respondents, the Michigan Education Association (MEA) and its local affiliate, the Saginaw Education Association, appeal as of right from the September 23, 2015 decision of the Michigan Employment Relations Commission (MERC) declaring in violation of PERA a union rule that allows members to resign only during a one-month window each year, and ordering those respondents to accept resignations the charging parties offered outside that window. The attendant charging parties in turn cross-appeal from that order insofar as it rejected their claim that respondents violated their duty of fair representation by not more actively informing its members of their resignation rights.

In Docket No. 331398, respondent the Standish-Sterling Education Support Personnel Association MEA/NEA appeals from the January 15, 2016 decision of the MERC insofar as it, too, recognized the attendant parties' right to end their union affiliations at will.

In Docket Nos. 331762 and 331875, respondents the MEA and its local affiliates, the Grand Blanc Clerical Association and the Battle Creek Educational Secretaries Association, appeal as of right from the February 11, 2016 decision of the MERC insofar as the MERC again held that the charging parties were entitled to end union affiliations at will. The latter union and the MEA additionally contend that the MERC erred in declining to dismiss the charge underlying Docket No. 331875 as untimely.

For the reasons set forth below, we affirm all of the MERC decisions at issue.

I. STATUTORY AND PROCEDURAL HISTORY

A. RIGHT-TO-WORK LEGISLATION

Section 9(1)(a) of PERA, MCL 423.209(1)(a), establishes that public employees may organize themselves into collective bargaining units. 2012 PA 349, effective March 28, 2013,

-4-

added § 9(1)(b), establishing that public employees may refrain from such activity. 2012 PA 349 also added subsection (2), which prohibits any person from resorting to coercion to compel a public employee to become or remain a member of a labor organization, to compel a public employee to refrain from doing so, or to compel a public employee to support such an organization financially. Section 10(1)(a) of PERA, MCL 423.210(1)(a), in turn prohibits a public employer from interfering with, restraining, or coercing public employees "in the exercise of their rights guaranteed in section 9." Section 10(2)(a) imposes the same prohibition on labor organizations while adding that it "does not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership." 2012 PA 349 added subsection (3), which, but for exceptions not applicable here, prohibits requiring "an individual . . . as a condition of obtaining or continuing public employment" to "[b]ecome or remain a member of a labor organization or bargaining representative," to support such an organization financially, or to "[r]efrain or resign from membership in, voluntary affiliation with, or voluntary financial support of a labor organization or bargaining representative." MCL 423.210(3). 2012 PA 53, effective March 16, 2012, amended § 10 to prohibit public school employers from using "public school resources to assist a labor organization in collecting dues or service fees from wages of public school employees" except in connection with collective bargaining agreements already in effect when that provision became operative. MCL 423.210(1)(b).

## B. DOCKET NOS. 329419 AND 329425-329431

The MERC's decision and order in connection with the eight cases involving the Saginaw Education Association included a convenient summary of the underlying facts:

> [E]ach of the Charging Parties is employed by Saginaw Public Schools (Employer) and is part of the bargaining unit represented by the Respondent Saginaw Education Association (SEA). The SEA is a local affiliate of Respondent Michigan Education Association (MEA), and members of the SEA are also members of the MEA and the National Education Association (NEA) due to the organizations' unified membership structure.
>
> Around the time they were hired, each of the Charging Parties signed a "Continuing Membership Application" agreeing to join Respondents' unions and authorizing the Employer to deduct union dues from their pay and transmit those funds to Respondent SEA. Just above the signature line on the application, there are two checkboxes, one for cash payment and one for payroll deduction. The language next to the cash payment checkbox states: "Membership is continued unless I reverse this authorization in writing between August 1 and August 31 of any year." The language next to the payroll deduction checkbox states: "I authorize my employer to deduct Local, MEA and NEA dues, assessments and contributions as may be determined from time to time, unless I revoke this authorization in writing between August 1 and August 31 of any year." . . .
>
> Article I of the MEA bylaws provides in relevant part: . . . "Continuing membership in the Association shall be terminated at the request of a member when such a request is submitted to the Association in writing, signed by the

member and postmarked between August 1 and August 31 of the year preceding the designated membership year." . . .

The collective bargaining agreement between the Employer and Respondent SEA that covered the 1995 to 1998 academic years contained a union security agreement and required the Employer to deduct union dues from employees' wages when authorized by the respective employees. That contract expired June 30, 1998. The subsequent collective bargaining agreements did not contain a union security agreement, but did require the Employer to deduct union dues from employees' wages when authorized by the respective employees. . . .

2012 PA 53 . . . which amended PERA to prohibit public school employers from assisting labor organizations in collecting union dues or service fees, became effective March 16, 2012. However, where the public school employer collected dues or service fees pursuant to a collective bargaining agreement that was in effect on the effective date of Act 53, the prohibition did not apply until the contract expired. The collective bargaining agreement in place immediately prior to the matter at issue expired on June 30, 2013.

On December 11, 2012, the Michigan Legislature passed 2012 PA 349, which, among other things, expressly provided that public employees have a right to refrain from union activity and made agency shop illegal for most public employees.

On January 18, 2013, Respondent MEA prepared a letter designed to be provided to members who inquired about resigning from membership. The letter indicated that resignation from membership must be submitted in writing and postmarked during the annual August window period.

Pursuant to 2012 PA 53, which prohibited public school employers from collecting union dues or services fees from their employees, the Employer ceased dues deductions after the collective bargaining agreement with Respondent SEA expired on June 30, 2013. Subsequently, Respondents established an e-dues program to allow employees to pay their union dues electronically. . . . None of the four Charging Parties signed up for the e-dues program; nor did any of the four pay union dues after the Employer stopped dues deductions.

\* \* \*

In September 2013, [three] Charging Parties . . . sent letters to Respondents resigning from the Unions and revoking their dues deduction authorizations. Respondents informed each of them that their resignations were not timely in light of the August window period for resignations. . . .

Also, in September 2013, [the fourth charging party] told an SEA representative that he no longer wanted to pay union dues. On September 11, he received an e-mail from an MEA UniServ director acknowledging his statement that he was "not interested in paying dues at this time" and asking him to meet

with her to discuss his options in light of that statement. On October 7, [that charging party] sent an e-mail to Respondents explaining that he had assumed he was no longer a union member if he did not sign up for the e-dues program. . . . In response, Respondents' agent . . . explained the window period, and informed him that failing to sign up for the e-dues program did not constitute a resignation from the Unions.

On October 21, 2013, the charging parties filed unfair labor practice charges, alleging violations of MCL 423.209(2)(a) and MCL 423.210(2)(a), as recently amended. The following month, they amended their respective charges to allege that respondents had breached their duties of fair representation for having "restrained or coerced Charging Parties in the exercise of their § 9 right to refrain from joining and/or assisting a labor organization." Thus, the charging parties alleged that respondents violated "§ 10(2)(a) of PERA, by refusing to allow Charging Parties to resign their memberships when they attempted to do so and by threatening to attempt to collect dues they allegedly owed by hiring a debt collector and/or suing Charging Parties to collect the alleged debt." The charging parties further alleged that respondents "violated their duty of fair representation under § 10(2)(a) by failing to adequately notify them and other teachers of the 'steps they would need to take to extricate themselves fully from any financial obligation to the unions.'"

The administrative law judge (ALJ) concluded that the insertion of right-to-refrain language in § 9 of PERA occasioned a departure from earlier caselaw regarding "whether the MEA's August window period violates § 10(2)(a) of PERA."[1] The ALJ then surveyed instructive caselaw and stated that "[i]t is unclear whether a member could, by any means, waive his or her right to resign full membership at any time," but that "it is clear . . . that members do not waive their right to resign full membership merely by voluntarily becoming a member of a union that has a rule in its constitution or bylaws restricting the right to resign." The ALJ elaborated that an employee may waive the right to refrain from continuing financial support of a union after resigning, but that "because this is an agreement to waive a statutory right, the waiver must be clear, explicit, and unmistakable." The ALJ opined that the charging parties "did not clearly and explicitly waive that right either by joining Respondents when that organization had a bylaw that restricted when they could resign or by the Continuing Membership agreements which they signed," and that respondents' "continued maintenance and enforcement of the August window period . . . violated § 10(2)(a) of PERA because it constituted an unlawful restriction on employees' right to resign."

Respondents objected that the MERC lacked jurisdiction over what respondents characterized as an internal union matter. They argued alternatively that 2012 PA 349 did not allow union members to resign at will, and that ordering respondents to refrain from maintaining

---

[1] Specifically, the MERC concluded in *West Branch Rose City EA, MEA,* 17 MPER 25 (2004), that the MEA's window period was reasonable and organizationally necessary. However, *West Branch* was decided before 2012 PA 349 added the "right to refrain" language to PERA, and the MERC noted that it would not infer such a right in the absence of clear legislative intent. The passage of 2012 PA 349 adding such language in § 9(1)(b) provided such clear legislative intent.

and enforcing the policy restricting the timing of resignations would bring about an unconstitutional impairment of respondents' contractual relation with their members.

The MERC rejected these arguments. Concerning its jurisdiction, the MERC noted that recent statutory amendments to PERA prohibited unions or employers from requiring employees to financially support unions, and expressly recognized the right of public employees to refrain from joining or supporting labor organizations. Thus, the MERC concluded, "we have jurisdiction to determine whether Respondents' actions in refusing to allow Charging Parties to resign from the Unions outside the August window period is an unlawful restraint on Charging Parties' right to refrain from union activity."

The MERC further opined that respondents' retention of the right to make their own rules concerning the acquisition or retention of members under § 10(2)(a) did not permit them to deny public employees the rights provided by § 9, which now included the right to refrain from union activity. "Accordingly, . . . where employees have a right to refrain from union activity, the union may not make rules interfering with or restraining employees in the exercise of that right." The MERC additionally opined that "as of the effective date of Act 349, Charging Parties had the right to resign their union memberships, subject to any lawful constraints in the parties' membership contract," and also that "Charging Parties' membership obligations to Respondents, including the obligation to pay dues, should end at the point Charging Parties provided the Unions with notice of their resignations." Accordingly, "the Unions' refusal to allow Charging Parties to resign their union memberships after Charging Parties effectively notified Respondent SEA of their respective resignations [constituted] a breach of the duty of fair representation in violation of § 10(2)(a) of PERA."

Concerning the claim of unconstitutional impairment of contract rights, the MERC concluded that "the language of § 10(5) indicates that the Legislature intended to make it clear that the changes to PERA in § 10(3) were not to impair existing contracts." Additionally, to the extent that other amendments establishing an immediate right to refrain from union affiliation worked a substantial impairment of existing contractual rights, such impairment was justified in light of the "significant and legitimate public purpose" behind the legislation.

The charging parties asserted that the ALJ erred by concluding that respondents had not failed in any duty to provide its members with "adequate information to make an informed choice during the August window period." The MERC agreed with the ALJ that the record indicated that respondents had not violated any duty to provide information regarding how the recent legislation affected their members' resignation opportunities.

### C. DOCKET NO. 331398

The MERC's summary of the facts underlying its decision and order in connection with respondent the Standish-Sterling Educational Support Personnel Association included the following:

> Charging Party . . . is employed as a custodian by the Standish-Sterling Community Schools (the Employer) and is part of the bargaining unit represented by the Respondent Standish-Sterling Educational Support Personnel Association (SSESPA). The SSESPA is a local affiliate of the Michigan Education Association (MEA), and members of the SSESPA are also members of the MEA and the National Education Association (NEA) . . . .

-8-

On September 14, 2001, the Charging Party signed a "Continuing Membership Application" agreeing to join Respondent and authorizing the Employer to deduct union dues from his pay and transmit those funds to Respondent. On the application, . . . language next to the payroll deduction checkbox states: "I authorize my employer to deduct Local MBA and NEA dues, assessments and contributions as may be determined from time to time, unless I revoke this authorization in writing between August 1 and August 31 of any year." Charging Party checked the box for payroll deduction.

\* \* \*

Respondent and the Employer have been party to a series of collective bargaining agreements each of which contained a provision requiring members of Respondent's bargaining unit to authorize the Employer to deduct union membership dues or service fees from their paychecks. . . . The most recent agreement was entered into on November 12, 2012, and expired on June 30, 2015.

\* \* \*

On October 7, 2013, . . . Charging Party sent a letter to the MEA UniServ Director resigning from the Union, notifying the Union that he would only pay those dues and fees he could lawfully be compelled to pay as a condition of employment, and revoking his dues deduction authorization. On October 31, 2013, Respondent informed Charging Party that his resignation was not timely in light of the August window period for resignations.

\* \* \*

Charging Party continued to pay full dues after receiving Respondent's October 31, 2013 letter and, on February 6, 2014, filed the instant unfair labor practice charge against Respondent.

As noted, the issues raised in Docket No. 331398 are identical to those raised in the several consolidated appeals discussed above, which the MERC decided in this case consistently with its decision in the above cases.

### D. DOCKET NOS. 331762 AND 331875

The cases involving respondents the MEA and its local affiliates the Battle Creek Educational Secretaries Association (BCESA) and the Grand Blanc Clerical Association (GBCA) also resulted from continuing membership agreements through which the charging parties authorized their employers, the Battle Creek Schools and the Grand Blanc Schools, respectively, to deduct union dues from their paychecks. The last collective bargaining agreement between the Battle Creek Schools and respondent BCESA containing a union security agreement expired before April 2013. The last collective bargaining agreement between the Grand Blanc Schools and the respondent the Grand Blanc Clerical Association that contained a union security agreement and a dues check-off provision expired on June 30, 2013.

The MERC summarized the case involving respondents the BCESA and the MEA as follows:

On April 4, 2013, . . . Charging Party . . . sent a letter to the MEA resigning from membership in the Union and revoking her dues deduction authorization. On April 17, 2013, the MEA informed her that her resignation was not timely because it was not submitted during the August window period for resignations. Charging Party . . . continued to pay dues through June 2013.

On September 17, 2013, after receiving a BCESA communication regarding the MEA's e-dues process, [the charging party] sent an email to the MEA stating that she had resigned in April:

I received information regarding upcoming dues you are expecting from me. I would like to remind you that I sent my resignation letter to you last April which was effective immediately. I understood it would not be effective until August of this year and I continued to pay my dues. Please let the appropriate departments know that I will not be paying any more dues since I am no longer a paying member.

On October 9, the MEA . . . again informed [the charging party] that her resignation was not timely. [The charging party] replied on October 10 as follows:

I have resigned and that is it. I will no longer be paying union dues. . . . [W]hen Michigan passed its Right to Work law, it also amended its public-sector labor law to provide employees with a new right to "refrain" from joining or supporting a union. . . . Therefore it is illegal now to make restrictions on resignation in Michigan.

On October 31, 2013, [the charging party] received a letter from MEA . . . in which the executive director . . . stated that . . . her resignation was ineffective because it was not submitted during the MEA' s August window period.

[The charging party] again emailed the MEA and reiterated her belief that she resigned in April and informed the MEA that she would not be paying any more dues. On March 18, 2014, [she] filed the unfair labor practice charge involved in this dispute.

In the case involving respondents the GBCA and the MEA, the charging party sent a letter to the MEA announcing her resignation on November 4, 2013. On December 19, 2013, the MEA replied that, to be effective, her resignation must be submitted between August 1 and August 31. Respondent continued to demand dues and other assessments through April 2014. The charging party sent a check covering dues through her November resignation date, and filed her unfair labor practice charge.

-10-

As noted, the issues raised in these two appeals are identical to those raised in the several consolidated appeals discussed above; the MERC resolved the issues consistently with its decisions in the other cases.

Respondent the BCESA additionally objected that its charging party's March 18, 2014 unfair labor practice charge was not filed within six months of the MEA's April 2013 refusal to accept her resignation. The MERC rejected that challenge by calculating the period of limitations as starting not with the initial MEA communication refusing to recognize the resignation, but with the MEA's October 2013 rejection of the charging party's efforts in September 2013 to confirm or effectuate her resignation.

## II. ANALYSIS

### A. JURISDICTION

All respondents challenge the MERC's jurisdiction to decide whether respondent unions' continued practice of accepting resignations during only limited windows of opportunity violated PERA, as recently amended.

A tribunal must be vigilant in respecting the limits of its jurisdiction. See *Straus v Governor*, 230 Mich App 222, 227; 583 NW2d 520 (1998). The existence of jurisdiction is a question of law that this Court reviews de novo. *Etefia v Credit Technologies, Inc*, 245 Mich App 466, 472; 628 NW2d 577 (2001). Issues of statutory interpretation are also reviewed de novo. *In re Complaint of Rovas*, 482 Mich 90, 102; 754 NW2d 259 (2008). A reviewing court should give an administrative agency's interpretation of statutes it is obliged to execute respectful consideration, but not deference. *Id.* at 108.

" 'The power and authority to be exercised by boards or commissions must be conferred by clear and unmistakable language, since a doubtful power does not exist.' " *Union Carbide Corp v PSC*, 431 Mich 135, 151; 428 NW2d 322 (1988) (quotation marks and citation omitted). Accordingly, "powers specifically conferred on an agency cannot be extended by inference; . . . no other or greater power was given than that specified." *Herrick Dist Library v Library of Mich*, 293 Mich App 571, 582-583; 810 NW2d 110 (quotation marks and citations omitted). However, an administrative agency may exercise such implied authority as is "necessary to the due and efficient exercise of the powers expressly granted by the enabling statute." *Id.* at 586 (quotation marks and citation omitted).

MCL 423.201(b) states that "commission," for purposes of PERA, "means the employment relations commission . . . ." This Court has noted that "[t]he PERA provides that the Michigan Employment Relations Commission (MERC), the agency created to administer the act, has both *exclusive jurisdiction* over claims involving [unfair labor practices] *and* the power, through resort to injunctive relief, to prevent or correct ULPs." *Senior Accountants, Analysts & Appraisers Ass'n v Detroit*, 218 Mich App 263, 272; 553 NW2d 679 (1996).

At issue is whether the MERC properly exercised jurisdiction over the question of respondents' resignation windows, given that the issue related to union management with no direct relationship on conditions of employment. In rejecting the jurisdictional challenge, the MERC noted that the recent amendments to PERA prohibited unions or employers from

requiring employees to support unions financially, and expressly recognized the right of public employees to refrain from joining or supporting labor organizations. Accordingly, the MERC concluded that it had jurisdiction to determine whether unions' actions in refusing to allow their members to resign from them outside the August window periods was an unlawful restraint on the members' rights to refrain from union activity.

Respondents argue that the MERC exceeded its statutory authority in reaching the issue of resignation windows, asserting that in doing so it "has interpreted out of existence" the provisions of §§ 9(2), 9(3), and 10(3) of PERA. However, MCL 423.209(3) merely sets forth the penalty for violations of subsection (2), and respondents do not explain why the MERC's having decided the issue of resignation windows is inconsistent with MCL 423.209(2)(a)'s command that no person "force" a public employee to "remain a member of a labor organization or bargaining representative or otherwise affiliate with or financially support a labor organization or bargaining representative." We agree with the reasoning implicit in the MERC's decision that restricting the opportunity to resign from a union to one month out of the year effectively forces continued affiliation for however long it happens to take in a given situation until that time of year arrives.

Respondents emphasize that MCL 423.210(3)(b) sets forth its prohibition of requiring a person to "remain a member of a labor organization or bargaining representative" only where that requirement is imposed "as a condition of obtaining or continuing public employment." However, bearing more directly on the issue is subsection (2)(a), which, again, prohibits a labor organization from restraining or coercing public employees "in the exercise of the rights guaranteed in section 9."

Recent caselaw offers some guidance:

Notably, the Legislature did not change MCL 423.210(2)(a) when it enacted the "Right to Work" law in 2012. We conclude that the plain language of MCL 423.210(2)(a) makes all of the provisions of MCL 423.209, including MCL 423.209(2)(a), "rights guaranteed in section 9" under MCL 423.210(2)(a). Therefore, the violation thereof by defendants alleged by plaintiff is an "unfair labor practice[]" pursuant to MCL 423.216. [*Bank v Mich Ed Ass'n-NEA*, 315 Mich App 496, 501-502; ___ NW2d ___ (2016).]

For these reasons, we conclude that the MERC correctly recognized its jurisdiction to decide the question of the propriety of unions' confining their members' resignation opportunities to one month each year.

## B. UNION MEMBERSHIP AND GOVERNANCE

Respondents contend MERC's conclusion that respondents breached the duty of fair representation by refusing to immediately cancel the charging parties' memberships or financial obligations upon request was without factual support, and that the duty of fair representation does not apply to the formation or enforcement of membership agreements that have no direct impact on employment. We hold that, given the recent amendments to PERA, the MERC

committed no substantial or material error of law in concluding that respondents' resignation windows consisting of one month per year constituted unfair labor practices under PERA.

"Appellate review of a MERC decision is limited." *Org of Sch Administrators & Supervisors, AFSA, AFL-CIO v Detroit Bd of Ed*, 229 Mich App 54, 64; 580 NW2d 905 (1998). The MERC's "findings of fact are conclusive if they are supported by competent, material, and substantial evidence on the record considered as a whole." *Grandville Muni Executive Ass'n v City of Grandville*, 453 Mich 428, 436; 553 NW2d 917 (1996), citing Const 1963, art 6, § 28; see also MCL 423.216(e). "The MERC's legal determinations may not be disturbed unless they violate a constitutional or statutory provision or they are based on a substantial and material error of law." *Grandville Muni Executive Ass'n*, 453 Mich at 436, citing MCL 24.306(1)(a) and (f).

The legislature's recent enactment of MCL 423.209(2)(a) prohibits a person from forcing a public employee to "remain a member of a labor organization or bargaining representative or otherwise affiliate with or financially support a labor organization or bargaining representative." MCL 423.210(1)(a) in turn prohibits a public employer from interfering, restraining, or coercing public employees "in the exercise of their rights guaranteed in section 9." MCL 423.210(2)(a) imposes the same prohibition on labor organizations while adding that it "does not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership."

Respondents insist that their policy allowing members only a one-month window per year to resign falls under MCL 423.210(2)(a)'s provision preserving a labor organization's right "to prescribe its own rules with respect to the acquisition or retention of membership." The MERC acknowledged that unions generally retain the right to make rules governing when an employee may become, or cease to be, a member, where those rules do not affect the members' employment relationships. The MERC noted, however, that respondents offered no authoritative support for the proposition that a rule limiting resignation rights to an annual one-month period was permissible under § 10(2)(a) in the face of legislation expressly recognizing a union member's rights to refrain from union activity.

The MERC additionally took instruction from the United States Supreme Court's construction of nearly identical language in 29 USC 158(b)(1)(A)[2], where the Court held that "[n]either the [National Labor Relations] Board nor this Court has ever interpreted the proviso as allowing unions to make rules restricting the right to resign. Rather, the Court has assumed that 'rules with respect to the . . . retention of membership' are those that provide for the expulsion of

---

[2] 29 USC 158(b)(1)(A) provides that it shall be an unfair labor practice for a labor organization or its agents to restrain or coerce employees in the exercise of the rights guaranteed in 29 USCA 157, "*Provided*, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein."

employees from the union."[3]  *Pattern Makers' League of North America*, 473 US 95, 107-109; 105 S Ct 3064; 87 L Ed 2d 68 (1985).

Respondents undertake to distinguish *Pattern Makers'* on two grounds.  First, *Pattern Makers'* concerned the reasonableness of the National Labor Relations Board's holding that for a union to fine an employee who resigns from membership and then returns to work during a strike is to engage in an unfair labor practice.  Second, the United States Supreme Court reasoned that, at the time of the enactment of the federal legislation respecting a union's right to make its own rules regarding the acquisition or retention of membership, restrictions in union constitutions or bylaws on the right to resign were generally unknown, and thus, could not have been contemplated by Congress when it enacted the provision.  See *Pattern Makers'*, 473 US at 102-103, 110.  By contrast, respondents contend, the MERC has recognized such restrictions since at least 1970, and had earlier approved one-month resignation windows.  Respondents further contend that the pertinent federal legislation and caselaw addressed a history of "abuses" involving union membership as a condition of employment.

In our view, however, the pertinent statutory history is that of our own Legislature's having enacted the right-to-work amendments to PERA against the historical backdrop that respondents describe.  The obvious intent behind MCL 423.209(1)(b) and MCL 423.209(2), whether we agree with it or not, included protecting public employees against barriers to acting on the desire to discontinue union affiliation or support.

For these reasons, the MERC correctly concluded that "the language of § 10(2)(a) relied upon by Respondents does not permit unions to deny a public employee the rights provided by § 9, which now include the right to refrain from union activity," and, that "where employees have a right to refrain from union activity, the union may not make rules interfering with or restraining

---

[3] In support of this assertion, the Court referred to legislative history of the Taft-Hartley Act consistent with the Court's interpretation of the proviso:

> Senator Holland, the proviso's sponsor, stated that § 8(b)(1)(A) should not outlaw union rules "which ha[ve] to do with the admission *or the expulsion* of members." 93 Cong Rec 4271 (1947) (emphasis added).  Senator Taft accepted the proviso, for he likewise believed that a union should be free to "refuse [a] man admission to the union, or *expel him from the union*."  *Id*. at 4272 (emphasis added). Furthermore, the legislative history of the Labor-Management Reporting and Disclosure Act of 1959, 29 USC § 401 *et seq*., confirms that the proviso was intended to protect union rules involving admission and expulsion.  Accordingly, we find no basis for refusing to defer to the [National Labor Relations] Board's conclusion that League Law 13 is not a "rule with respect to the retention of membership," within the meaning of the proviso. [*Pattern Makers*, 473 US 95, 109-110; 105 S Ct 3064, 3072-3073; 87 L Ed 2d 68 (1985) (alterations in the original).]

employees in the exercise of that right."[4]  Accordingly, the MERC did not commit a substantial and material error of law when it concluded that, in limiting resignation opportunities to one month of each year, respondents were stepping beyond establishing membership policy and governance as allowed under § 10(2)(a) and into the substantial forcing of continued union affiliation or support in violation of MCL 423.209(2)(a).  Section 9(2)(a) commands that no person "force" a public employee to "remain a member of a labor organization or bargaining representative or otherwise affiliate with or financially support a labor organization or bargaining representative," and  is made applicable to labor organizations through MCL 423.210(2)(a).

---

[4] We note that this interpretation of the "right to refrain" language is consistent with relevant case law interpreting "right to refrain" language found in the federal analogue to MCL 423.209(1), 29 USC 157.  The National Labor Relations Board opined in *Machinists Local 1327 (Dalmo Victor II)*, 263 NLRB 984 (1982), enf denied, 725 F2d 1212 (CA 9, 1984), that restricting the right to resign for 30 days for union members who resigned while a strike was looming or ongoing was reasonable given the competing interests of the union and the would-be resigner.  In a seminal concurrence, two members of the Board (members Van De Water and Hunter) stated that *any* restraint on the right to resign violated a member's statutory right to refrain under 29 USC 157.  In *Int'l Ass'n of Machinists & Aerospace Workers, Local Lodge 1414, AFL-CIO (Neufeld Porsche-Audi)*, 270 NLRB 209 (1984), the Board relied on several decisions from the United States Supreme Court that, among other things, developed the distinction between internal union actions and external matters, to overrule *Dalmo Victor II* and its progeny and adopted the position of Van De Water and Hunter.  It was this position that the United States Supreme Court cited with approval in *Pattern Makers*, 473 US 105, as consistent with the policy of voluntary unionism.  Subsequent to its *Pattern Makers* decision, the Court granted certiorari for *Dalmo Victor* and remanded it to the 9th Circuit Court of Appeals for further consideration in light of *Pattern Makers*.  *NLRB v Machinists Local 1327, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO, Dist Lodge 115*, 473 US 901; 105 S Ct 3517 (Mem); 87 L Ed 2d 646 (1985) (1985).

As the ALJ in the cases at bar pointed out, *Pattern Makers* and its predecessors discussed voluntary unionism in the context of full union membership rather than "financial-core" membership.  In other words, the cases addressed when a full union member could resign and escape the discipline of the union for actions like not supporting a concerted action, rather than when a member whose obligation to the union extended only to financial support could resign. In *Int'l Brotherhood of Electrical Workers, Local 2088 (Lockheed Inc)*, 302 NLRB 322 (1991), the Board extended the principle of voluntary unionism to allow a financial-core member not subject to a union security agreement to resign outside the window provided by the member's dues-checkoff authorization agreement.  While decisions of the NLRB certainly are not binding, Michigan courts have long recognized that "precedents under the National Relations Act (NLRA), from which the PERA is derived, are to be persuasively considered." *Lamphere Sch v Lamphere Federation of Teachers*, 400 Mich 104, 120; 252 NW2d 818 (1977); *Detroit Police Officers Assoc v City of Detroit*, 137 Mich App 87, 95; 357 NW2d 816 (1984).

## C. WAIVER

Respondents argue that the MERC erred in rejecting their argument that the charging parties waived the right to discontinue union affiliation at will by voluntarily entering into membership agreements that limited their resignation rights to the specified annual periods.[5] Respondents emphasize that the agreements at issue here were not the product of collective bargaining, and did not address any condition of employment, and characterize those agreements as contracts whose terms the MERC should have enforced.

The United States Supreme Court has recognized that "many union rules" violate members' statutory rights even though otherwise "valid under the common law of associations." *Pattern Makers'*, 473 US at 113. The Court similarly acknowledged the rationale that "a member, by joining the union, enters into a contract, the terms of which are expressed in the union constitution and by-laws," but held that "union discipline cannot be analyzed primarily in terms of the common law of contracts," because union membership "contemplates a continuing relationship with changing obligations . . . as far removed from the main channel of contract law as the relationships created by marriage, the purchase of a stock certificate, or the hiring of a servant." *Id.* at 113 n 26 (quotation marks and citation omitted). We agree that respondents' reliance on conventional contract principles in this instance is inapt.

The MERC distinguished union *membership* in the sense of formal personal affiliation from *financial-core membership*, meaning the obligation to pay union dues or related fees, and it refrained from deciding whether the right to resign union membership in the pure sense may be waived while holding that a member may contractually waive the right to disengage from financial-core commitments at will if doing so in clear, explicit, and unmistakable terms.[6]

The MERC correctly recognized that waivers of statutory rights must be clear and unambiguous. See *Staple v Staple*, 241 Mich App 562, 568; 616 NW2d 219 (2000); 51A CJS, Labor Relations, § 330, p 37 ("The contractual waiver of a statutory right in a labor agreement must be clear and unmistakable or must be established by clear and express contractual language."). We further agree with the MERC that merely joining or remaining a member of a union with a bylaw or constitutional provision purporting to limit the right to resign does not constitute a clear, explicit and unmistakable waiver of the statutory right to refrain from union affiliation. The MERC also correctly differentiated, for present purposes, membership in a union from financial support of a union. See *Communications Workers of American v Nat'l Labor*

---

[5] Although respondent the Standish-Sterling Education Support Personnel Association joined the other respondents in raising this issue in the cases below, the MERC expressly declined to decide it in connection with that respondent on the ground that it was simply satisfied to recognize that the pertinent charging party's "resignation from the union, though outside the window period, was sufficient to end his membership." Where a party has raised an issue below, the lower tribunal's failure to decide it should not be treated as the party's failure to preserve it. See *Klooster v Charlevoix*, 488 Mich 289, 310; 795 NW2d 578 (2011).

[6] See, e.g., *Lockheed Inc*, 302 NLRB 49.

*Relations Bd*, 215 F2d 835, 838 (CA 2, 1954) ("a member of a voluntary association is free to resign at will, subject of course to any financial obligations due and owing the association").

As an initial matter, we note that the charging parties signed their membership agreements before enactment of the right to refrain language in PERA, and when their collective bargaining agreements authorizing their employers' collection of dues expired, they attempted in various ways to resign or let their membership lapse. The union agreements here at issue did not define "membership" as the obligation to pay dues or fees, or otherwise specify that restrictions set forth on disassociation opportunities were limited to the latter. For that reason, and because the restrictions on resignation opportunities as set forth merely reflected general union policy, we agree with the MERC that the charging parties below did not clearly, explicitly, and unambiguously waive their right to discontinue their financial support of, or other forms of affiliation with, their respective respondent unions.

Accordingly, we conclude that the MERC correctly held that the right to discontinue financially supporting a union may be waived if the waiver is clear, explicit, and unmistakable, but that the agreements upon which respondents rely did not constitute such explicit and unmistakable waivers of the charging parties' statutory right to refrain from union membership at any time.

## D. EXPRESSIVE ASSOCIATIONAL RIGHTS

Respondents argue that the MERC's determinations that the charging parties did not have to respect respondents' resignation windows intruded on the latter's expressive or associational rights under the federal and state constitutions. See US Const, Am I; Const 1963, art 1, §§ 3, 5. In raising this issue, however, respondents fail to address the question of preservation below, in violation of MCR 7.212(C)(7), or otherwise give any indication that the MERC was asked to consider it.[7] Although this Court reviews constitutional questions de novo, *In re Ayres*, 239 Mich App 8, 10; 608 NW2d 132 (1999), unpreserved issues are reviewed for plain error affecting substantial rights, *Kern v Blethen-Coluni*, 240 Mich App 333, 336; 612 NW2d 838 (2000).

Respondents argue that the MERC's interpretation of the pertinent statutory scheme, as recently amended, to allow union members to withdraw their union support at will infringes upon their associational rights. The obvious retort is that to hold otherwise, such that labor organizations could hold members to financial obligations until the next resignation window came about, would infringe on their members' associational rights. Resolving that tension in favor of union members' freedom to disassociate better comports with the right-to-work, or right-to-refrain, policy now embodied within the PERA.

---

[7] Respondents remind this Court that the MERC does not have the authority to decide a constitutional claim, but nonetheless has a duty to interpret its enabling statutes in ways that avoid raising constitutional issues. See *Jackson Co Ed Assoc v Grass Lake Community Sch Bd of Ed*, 95 Mich App 635, 641; 291 NW2d 53 (1979).

Respondents protest that the MERC's decision in this regard "allows . . . individuals who would otherwise be excluded to elect Association leaders and spokespeople and to participate in governance decisions that directly shape the message and priorities of the Association." Further, it allows individuals to "take advantage of the member-only benefits available to them on September 1 and . . . resign on September 2, creating an entirely new class of free-rider," and also forces respondents "to convey the message that 'no commitment' 'free-riders' are welcome within the Association." We reject the characterization of the MERC's position concerning resignation windows as compelling respondents to accept the participation of members they would prefer to exclude. If respondents raise a legitimate concern over members' accepting a union benefit on one day then ending union support the next, and if locking members into fixed periods of obligation to provide financial support were the only way to avoid such imbalances between benefits received and contributions provided, respondents' remedy would be to offer membership agreements that clearly and unmistakably set forth waivers of the right to discontinue financial support before a specified date, as discussed above.

To the extent that respondents reiterate for this issue their arguments from contract law, we reiterate that the United States Supreme Court has recognized that "union discipline cannot be analyzed primarily in terms of the common law of contracts." *Pattern Makers'*, 473 US at 113 n 26.

For these reasons, we conclude that the MERC did not commit a substantial and material error of law, or plain error, when it decided these cases without taking it upon itself to develop and resolve in respondent's favor arguments relating to constitutional rights of expression and association.

## E.  IMPAIRMENT OF CONTRACT

Respondents argue that the MERC has interpreted 2012 PA 349 in a way that violates the constitutional prohibitions of legislation that impairs obligations of contract. See US Const, art I, § 10, cl 1 ("No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."); Const 1963, art 1, § 10 ("No . . . law impairing the obligation of contract shall be enacted.").

Respondents again rely on contract principles in support of their contention that the charging parties may not resign outside of the month of August in any given year, but this position is likewise foiled by the unsuitability of characterizing union membership agreements as contracts. See *Pattern Makers'*, 473 US at 113 n 26. Indeed, the impropriety of trying to analyze an issue of union discipline in accord with ordinary contract law is apparent from consideration of the criteria for analyzing a constitutional claim of this sort:

> A three-pronged test is used to analyze Contract Clause issues. The first prong considers whether the state law has operated as a substantial impairment of a contractual relationship. The second prong requires that legislative disruption of contractual expectancies be necessary to the public good. The third prong requires that the means chosen by the Legislature to address the public need be reasonable. . . . [I]f the legislative impairment of a contract is severe, then to be upheld, it must be affirmatively shown that (1) there is a significant and legitimate public purpose for the regulation and (2) that the means adopted to implement the

-18-

legislation are reasonably related to the public purpose. [*Health Care Ass'n Workers Comp Fund v Dir of Bureau of Worker's Compensation*, 265 Mich App 236, 241; 694 NW2d 761 (2005) (citations omitted).]

Because, as discussed above, the MERC correctly recognized that the relationship between union and union member is not strictly contractual in nature, and correctly took the position that the membership agreements on which respondents rely did not constitute waivers of the right to discontinue financial support for want of clear, explicit, and unmistakable statements to that effect, the MERC's determination that the charging parties' right to refrain from union participation included the right to discontinue financial support at will neither substantially impaired a contractual relationship nor disrupted contractual expectancies. Concerning whether the Legislature chose a reasonable means of addressing a public need, we hold that establishing a broad right to refrain from union affiliation is reasonably related to the legislatively identified public need for *voluntary* unionism.

For these reasons, we conclude that the MERC did not commit a substantial and material error of law in concluding that its recognition of the right to discontinue union support at will, absent a clear, explicit, and unmistakable waiver of that right, did not work a substantial impairment of the obligations of contract.

## F.  TIMELINESS OF ONE CHARGE

Respondents the BCESA and the MEA argue that the MERC erred by failing to recognize that its charging party in Docket No. 331875 filed her unfair labor practices charge after the applicable period of limitations had run. We disagree.

But for an exception relating to persons serving in the armed forces, a person bringing an unfair labor practice charge before the MERC must do so within six months of the act engendering the charge. MCL 423.216(a). That limitation period "commences when the person knows of the act which caused his injury and has good reason to believe that the act was improper or done in an improper manner." *Huntington Woods v Wines*, 122 Mich App 650, 652; 332 NW2d 557 (1983). "[I]t it not necessary that the person recognize that he has suffered invasion of a legal right." *Id.*

Not in dispute in this case is that the charging party e-mailed a letter in April 2013 to respondent announcing her resignation from the union and revocation of her authorization for a dues deduction, that the MEA's representative informed her by e-mail on April 17, 2013 that her resignation was untimely and would not be accepted, that she sent an e-mail on September 17, 2013 asserting that she had indeed resigned in April, and that on October 9, 2013 the MEA's representative again informed her that her resignation was not timely. The charging party then filed her unfair labor practice charge over the matter on March 18, 2014. The timeliness of that charge, then, depends on whether one calculates the period of limitations from the April 17, 2013 e-mail of the MEA's representative, or from that representative's e-mail of October 9, 2013 in response to the charging party's efforts in September 2013 to ensure that her membership had ended. The MERC deemed the charge timely on the ground that the October communication of the MEA's representative "constituted a separate, independent unfair labor practice in violation of §10(2)(a)."

Respondents protest that the MERC thus improperly afforded the charging party the benefit of the continuing wrongs doctrine, according to which "the period of limitations does not begin to run on the occurrence of the first wrongful act; rather, the period of limitations will not begin to run until the continuing wrong is abated." *Marilyn Froling Revocable Living Trust v Bloomfield Hills Country Club*, 283 Mich App 264, 280; 769 NW2d 234 (2009). We agree with respondents that application of the continuing wrongs doctrine in connection with an unfair labor practices charge would be inapt. See *Blazer Foods, Inc v Restaurant Props, Inc*, 259 Mich App 241, 247; 673 NW2d 805 (2003) (recognizing application of the doctrine only in connection with actions in trespass, nuisance, and civil rights); *Garg v Macomb Co Community Mental Health Servs*, 472 Mich 263, 290; 696 NW2d 646 (2005) ("the 'continuing violations' doctrine . . . has no continued place in the jurisprudence of this state"), amended on unrelated grounds on denial of rehearing 473 Mich 1205 (2005). But the MERC did not invoke the doctrine, having properly treated the MEA's October 2013 communication to the charging party not as a mere reiteration of its April 2013 communication, but as a separate and independent unfair labor practice.

The charging party made clear in her September 2013 communication that, at that time, she accepted respondents' assertion that her April 2013 resignation would not be effective until the following August, and that she had continued to pay her dues, but that when August came she expected respondents to accept her resignation without further action on her part. Accordingly, the MEA's representative's indication of a refusal, as communicated in October 2013, to honor the charging party's April resignation on any terms, including the charging party's expectation that it would become effective in August, was an adverse action in connection with a substantially new controversy. The MERC thus committed no legal error in treating the charge filed in March 2014 as timely relating to a grievance originating with the MEA's October 2013 communication.

## G. DUTY OF FAIR REPRESENTATION

On cross-appeal, the charging parties in the cases involving respondents the Saginaw Education Association and the MEA argue that the MERC erred in rejecting their contention that those unions violated their duty of fair representation by failing to provide sufficient information to their members on applicable resignation procedures. We agree with the MERC that the Legislature signaled that it did not intend for unions to spread information about 2012 PA 349 by having included within the legislation an appropriation to the Department of Licensing and Regulatory Affairs to respond to public inquiries, and to inform public employers, employees, and attendant labor organizations concerning their rights and responsibilities, regarding the legislation. See MCL 423.210(7)(a) and (c).

"It is clear that a labor organization has a duty, imposed by various labor law statutes, to fairly represent its members." *Goolsby v Detroit*, 419 Mich 651, 660; 358 NW2d 856 (1984), citing PERA, along with the National Labor Relations Act, 29 USC 151 *et eq.*, and the labor mediation act, MCL 423.1 *et seq.* "Under this doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Goolsby*, 419 Mich at 661. However, the cross-appealing charging parties cite no authority that stands for the proposition that a union's duty of fair representation extends to such activity antagonistic to the union goal of

promoting the mutual benefit of its membership as actively publicizing the procedures for disassociating from it.

We thus agree with the MERC that the Legislature recognized that the duty of fair representation did not include a duty to take active responsibility for disseminating information about the new options for disassociation from union activities under 2012 PA 349 by assigning that responsibility to the Department of Licensing and Regulatory Affairs.

Further, it is not as if the respondents at issue wholly failed to provide such information to their members. The MERC summarized the situation as follows, the factual particulars of which the cross-appealing charging parties do not dispute:

> Charging Parties' membership in the Unions was voluntary. . . . At the time each of them joined the Unions, they signed a Continuing Membership Application that provided their membership would continue unless they revoked the membership authorization in writing between August 1 and August 31 of any year. . . . That document put them on notice that they had the right to terminate both their membership and their obligation to pay union dues upon submitting written notice during August of any given year. . . . Charging Parties have not denied that they received a copy of the Continuing Membership Application. Moreover, the MEA bylaws contain language describing the procedure for resignation from membership. Those bylaws are posted on the MEA website and are available to the general public.
>
> . . . There is no evidence that Charging Parties requested information about the procedure for resigning before they submitted letters of resignation. After receiving Charging Parties' letters of resignation, Respondent informed them that, because they did not submit their resignations during the August window period, they could not resign at that time. Respondents provided each of the Charging Parties with information about resigning after they attempted to resign.
>
> While Respondents did not actively publicize the procedure for resignation, there is no evidence that either Respondent declined to provide the necessary information about resignation to any requesting union member. Indeed, the record indicates that the information was provided to any union member who requested it.

The MERC thus well identified enough avenues that respondents made available for their members to discover pertinent resignation procedures to put to rest the allegation that respondents engaged in some kind of campaign to exploit its members' ignorance in that regard.

For these reasons, we conclude that the MERC correctly concluded that respondents did not fall short of their duty of fair representation by declining to take the initiative to provide information to their members on applicable resignation procedures.

## III. CONCLUSION

To summarize, we hold that establishing a broad right to refrain from union affiliation is reasonably related to the legislatively identified public need for *voluntary* unionism. We conclude that, in a proper exercise of jurisdiction, the MERC committed no substantial or material error of law in concluding that respondents' resignation windows of one month per year constituted unfair labor practices under PERA as recently amended, and that such windows exceeded matters of internal union policy and governance. We further conclude that the MERC did not commit a substantial and material error of law, or plain error, when it decided these cases without taking it upon itself to develop and resolve in respondent's favor arguments relating to constitutional rights of expression and association, when it concluded that the right of a union member to resign union membership at will, absent a clear, explicit, and unmistakable waiver of that right, did not work a substantial impairment of the obligations of contract. Finally, we conclude that MERC committed no legal error in treating the charge filed in March 2014 (Docket No. 331875) as timely relating to a grievance originating with the MEA's October 2013 communication.

Affirmed.

/s/ Jane M. Beckering
/s/ Peter D. O'Connell
/s/ Brock A. Swartzle